## ZAUDERER *v.* OFFICE OF DISCIPLINARY COUNSEL OF THE SUPREME COURT OF OHIO

No. 83–2166.   Argued January 7, 1985—Decided May 28, 1985

WHITE, J., delivered the opinion of the Court, in which BLACKMUN and STEVENS, JJ., joined; in Parts I, II, III, and IV of which BRENNAN and MARSHALL, JJ., joined; and in Parts I, II, V, and VI of which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined. BRENNAN J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which MARSHALL, J., joined, *post*, p. 656. O'CONNOR, J., filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 673. POWELL, J., took no part in the decision of the case.

*Alan B. Morrison* argued the cause for appellant. With him on the briefs were *David C. Vladeck* and *David K. Frank.*

*H. Bartow Farr III* argued the cause for appellee. On the brief were *Angelo J. Gagliardo* and *Mark H. Aultman.**

JUSTICE WHITE delivered the opinion of the Court.

Since the decision in *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976), in which the Court held for the first time that the First Amendment precludes certain forms of regulation of purely commercial speech, we have on a number of occasions addressed the constitutionality of restraints on advertising and solicitation by attorneys. See *In re R. M. J.*, 455 U. S. 191 (1982); *In re Primus*, 436 U. S. 412 (1978); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977). This case presents additional unresolved questions regarding the regulation of commercial speech by attorneys: whether a State may discipline an attorney for soliciting business by running newspaper advertisements containing nondeceptive illustrations and legal advice, and whether a State may seek to prevent potential deception of the public by requiring attorneys to disclose in their advertising certain information regarding fee arrangements.

## I

Appellant is an attorney practicing in Columbus, Ohio. Late in 1981, he sought to augment his practice by advertising in local newspapers. His first effort was a modest one: he ran a small advertisement in the Columbus Citizen Journal advising its readers that his law firm would represent defendants in drunken driving cases and that his clients' "[f]ull legal fee [would be] refunded if [they were] convicted

---

*Briefs of *amici curiae* were filed for the American Civil Liberties Union et al. by *Bruce Campbell* and *Charles S. Sims;* and for A. H. Robins Co. by *E. Barrett Prettyman, Jr.*

of DRUNK DRIVING."[1]   The advertisement appeared in the Journal for two days; on the second day, Charles Kettlewell, an attorney employed by the Office of Disciplinary Counsel of the Supreme Court of Ohio (appellee) telephoned appellant and informed him that the advertisement appeared to be an offer to represent criminal defendants on a contingent-fee basis, a practice prohibited by Disciplinary Rule 2–106(C) of the Ohio Code of Professional Responsibility.   Appellant immediately withdrew the advertisement and in a letter to Kettlewell apologized for running it, also stating in the letter that he would decline to accept employment by persons responding to the ad.

Appellant's second effort was more ambitious.   In the spring of 1982, appellant placed an advertisement in 36 Ohio newspapers publicizing his willingness to represent women who had suffered injuries resulting from their use of a contraceptive device known as the Dalkon Shield Intrauterine Device.[2]   The advertisement featured a line drawing of the Dalkon Shield accompanied by the question, "DID YOU USE THIS IUD?"   The advertisement then related the following information:

---

[1] The advertisement notified the potential client that "[e]xpert witness (chemist) fees must be paid."   The only other information contained in the advertisement was the name of appellant's firm, its telephone number, and its address.

[2] An intrauterine device (or IUD) is "a plastic or metal coil, spiral, or other shape, about 25 mm long, that is inserted into the cavity of the womb to prevent conception.   Its exact mode of action is unknown but it is thought to interfere with implantation of the embryo."   Urdang Dictionary of Current Medical Terms 220 (1981).   The Dalkon Shield is a variety of IUD that was marketed in the early 1970's.   Because of evidence that the Shield was associated with a variety of health problems among users, the Shield was withdrawn from the market in 1974.   In 1980, the manufacturer advised physicians that they should remove the Shield from any woman still using it, and in 1983, the Food and Drug Administration followed suit.   In 1984, the manufacturer instituted a mass-media campaign urging women to have the device removed.   See Robins Mounts Drive to Settle Dalkon Suits, National Law Journal, Dec. 24, 1984, p. 1, col. 3.

"The Dalkon Shield Interuterine *[sic]* Device is alleged to have caused serious pelvic infections resulting in hospitalizations, tubal damage, infertility, and hysterectomies. It is also alleged to have caused unplanned pregnancies ending in abortions, miscarriages, septic abortions, tubal or ectopic pregnancies, and full-term deliveries. If you or a friend have had a similar experience do not assume it is too late to take legal action against the Shield's manufacturer. Our law firm is presently representing women on such cases. The cases are handled on a contingent fee basis of the amount recovered. If there is no recovery, no legal fees are owed by our clients."

The ad concluded with the name of appellant's law firm, its address, and a phone number that the reader might call for "free information."

The advertisement was successful in attracting clients: appellant received well over 200 inquiries regarding the advertisement, and he initiated lawsuits on behalf of 106 of the women who contacted him as a result of the advertisement. The ad, however, also aroused the interest of the Office of Disciplinary Counsel. On July 29, 1982, the Office filed a complaint against appellant charging him with a number of disciplinary violations arising out of both the drunken driving and Dalkon Shield advertisements.

The complaint, as subsequently amended, alleged that the drunken driving ad violated Ohio Disciplinary Rule 2–101(A) in that it was "false, fraudulent, misleading, and deceptive to the public"[3] because it offered representation on a contingent-fee basis in a criminal case—an offer that could not be carried out under Disciplinary Rule 2–106(C). With

---

[3] DR 2–101(A) provides that "[a] lawyer shall not, on behalf of himself, his partner, associate or any other lawyer affiliated with him or his firm, use, or participate in the use of, any form of public communication containing a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim."

respect to the Dalkon Shield advertisement, the complaint alleged that in running the ad and accepting employment by women responding to it, appellant had violated the following Disciplinary Rules: DR 2–101(B), which prohibits the use of illustrations in advertisements run by attorneys, requires that ads by attorneys be "dignified," and limits the information that may be included in such ads to a list of 20 items;[4]

---

[4] Disciplinary Rule 2–101(B), in its entirety, provides:

"In order to facilitate the process of informed selection of a lawyer by potential consumers of legal services, a lawyer may publish or broadcast, subject to DR 2–103, in print media or over radio or television. Print media includes only regularly published newspapers, magazines and other periodicals, classified telephone directories, city, county and suburban directories, law directories and law lists. The information disclosed by the lawyer in such publication or broadcast shall comply with DR 2–101(A) [see n. 3, *supra*] and be presented in a dignified manner without the use of drawings, illustrations, animations, portrayals, dramatizations, slogans, music, lyrics or the use of pictures, except for the use of pictures of the advertising lawyer, or the use of a portrayal of the scales of justice. Only the following information may be published or broadcast:

"(1) Name, including name of law firm and names of professional associates, addresses and telephone numbers;

"(2) One or more fields of law in which the lawyer or law firm is available to practice, but may not include a statement that the practice is limited to or concentrated in one or more fields of law or that the lawyer or law firm specializes in a particular field of law unless authorized under DR 2–105;

"(3) Age;

"(4) Date of admission to the bar of a state, or federal court or administrative board or agency;

"(5) Schools attended, with dates of graduation, degrees and other scholastic distinctions;

"(6) Public or quasi-public offices;

"(7) Military service;

"(8) Published legal authorships;

"(9) Holding scientific, technical and professional licenses, and memberships in such associations or societies;

"(10) Foreign language ability;

"(11) Whether credit cards or other credit arrangements are accepted;

"(12) Office and telephone answering service hours;

DR 2–103(A), which prohibits an attorney from "recommend-[ing] employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer"; and DR 2–104(A), which provides (with certain exceptions not applicable here) that "[a] lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice."

The complaint also alleged that the advertisement violated DR 2–101(B)(15), which provides that any advertisement that mentions contingent-fee rates must "disclos[e] whether percentages are computed before or after deduction of court costs and expenses," and that the ad's failure to inform clients that they would be liable for costs (as opposed to legal fees) even if their claims were unsuccessful rendered the advertisement "deceptive" in violation of DR 2–101(A). The complaint did not allege that the Dalkon Shield advertisement was false or deceptive in any respect other than its

---

"(13) Fee for an initial consultation;

"(14) Availability upon request of a written schedule of fees or an estimate of the fee to be charged for specific services;

"(15) Contingent fee rates subject to DR 2–106(C), provided that the statement discloses whether percentages are computed before or after deduction of court costs and expenses;

"(16) Hourly rate, provided that the statement discloses that the total fee charged will depend upon the number of hours which must be devoted to the particular matter to be handled for each client and the client is entitled without obligation to an estimate of the fee likely to be charged, in print size at least equivalent to the largest print used in setting forth the fee information;

"(17) Fixed fees for specific legal services;

"(18) Legal teaching positions, memberships, offices, committee assignments, and section memberships in bar associations;

"(19) Memberships and offices in legal fraternities and legal societies;

"(20) In law directories and law lists only, names and addresses of references, and, with their written consent, names of clients regularly represented."

omission of information relating to the contingent-fee arrangement; indeed, the Office of Disciplinary Counsel stipulated that the information and advice regarding Dalkon Shield litigation was not false, fraudulent, misleading, or deceptive and that the drawing was an accurate representation of the Dalkon Shield.

The charges against appellant were heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio. Appellant's primary defense to the charges against him was that Ohio's rules restricting the content of advertising by attorneys were unconstitutional under this Court's decisions in *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), and *In re R. M. J.*, 455 U. S. 191 (1982). In support of his contention that the State had not provided justification for its rules sufficient to withstand the First Amendment scrutiny called for by those decisions, appellant proffered the testimony of expert witnesses that unfettered advertising by attorneys was economically beneficial and that appellant's advertising in particular was socially valuable in that it served to inform members of the public of their legal rights and of the potential health hazards associated with the Dalkon Shield. Appellant also put on the stand two of the women who had responded to his advertisements, both of whom testified that they would not have learned of their legal claims had it not been for appellant's advertisement.

The panel found that appellant's use of advertising had violated a number of Disciplinary Rules. The panel accepted the contention that the drunken driving advertisement was deceptive, but its reasoning differed from that of the Office of Disciplinary Counsel: the panel concluded that because the advertisement failed to mention the common practice of plea bargaining in drunken driving cases, it might be deceptive to potential clients who would be unaware of the likelihood that they would both be found guilty (of a lesser offense) *and* be liable for attorney's fees (because they had not been convicted of drunken driving). The panel also found that the use of an illustration in appellant's Dalkon Shield advertisement

violated DR 2–101(B), that the ad's failure to disclose the client's potential liability for costs even if her suit were unsuccessful violated both DR 2–101(A) and DR 2–101 (B)(15), that the advertisement constituted self-recommendation in violation of DR 2–103(A), and that appellant's acceptance of offers of employment resulting from the advertisement violated DR 2–104(A).[5]

The panel rejected appellant's arguments that Ohio's regulations regarding the content of attorney advertising were unconstitutional as applied to him. The panel noted that neither *Bates* nor *In re R. M. J.* had forbidden all regulation of attorney advertising and that both of those cases had involved advertising regulations substantially more restrictive than Ohio's. The panel also relied heavily on *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), in which this Court upheld Ohio's imposition of discipline on an attorney who had engaged in in-person solicitation. The panel apparently concluded that the interests served by the application of Ohio's rules to advertising that contained legal advice and solicited clients to pursue a particular legal claim were as substantial as the interests at stake in *Ohralik*. Accordingly, the panel rejected appellant's constitutional defenses and recommended that he be publicly reprimanded for his violations. The Board of Commissioners adopted the panel's findings in full, but recommended the sanction of indefinite suspension from the practice of law rather than the more lenient punishment proposed by the panel.

The Supreme Court of Ohio, in turn, adopted the Board's findings that appellant's advertisements had violated the Disciplinary Rules specified by the hearing panel. 10 Ohio St. 3d 44, 461 N. E. 2d 883 (1984). The court also agreed with the Board that the application of Ohio's rules to appellant's advertisements did not offend the First Amendment. The

---

[5] The panel did not find that the advertisement's alleged lack of "dignity" or its inclusion of information not allowed by DR 2–101(B)(1)–(20) constituted an independent violation.

court pointed out that *Bates* and *In re R. M. J.* permitted
regulations designed to prevent the use of deceptive ad-
vertising and that *R. M. J.* had recognized that even non-
deceptive advertising might be restricted if the restriction
was narrowly designed to achieve a substantial state inter-
est. The court held that disclosure requirements applicable
to advertisements mentioning contingent-fee arrangements
served the permissible goal of ensuring that potential clients
were not misled regarding the terms of the arrangements.
In addition, the court held, it was "allowable" to prevent
attorneys from claiming expertise in particular fields of law
in the absence of standards by which such claims might be
assessed, and it was "reasonable" to preclude the use of il-
lustrations in advertisements and to prevent attorneys from
offering legal advice in their advertisements, although the
court did not specifically identify the interests served by
these restrictions. Having determined that appellant's ad-
vertisements violated Ohio's Disciplinary Rules and that the
First Amendment did not forbid the application of those rules
to appellant, the court concluded that appellant's conduct
warranted a public reprimand.

Contending that Ohio's Disciplinary Rules violate the First
Amendment insofar as they authorize the State to discipline
him for the content of his Dalkon Shield advertisement,
appellant filed this appeal. Appellant also claims that the
manner in which he was disciplined for running his drunken
driving advertisement violated his right to due process. We
noted probable jurisdiction, 469 U. S. 813 (1984), and now
affirm in part and reverse in part.[6]

---

[6] In its brief on the merits, appellee suggests that because appellant
received only a public reprimand—the least severe discipline that may be
imposed on an attorney who violates one of Ohio's Disciplinary Rules—the
judgment below must be affirmed if any one of the findings of a disciplinary
violation is sustainable. We disagree. The reprimand imposed on appel-
lant incorporated the opinion of the Supreme Court of Ohio as well as the

## II

There is no longer any room to doubt that what has come to be known as "commercial speech" is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded "noncommercial speech." *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60 (1983); *In re R. M. J.*, 455 U. S. 191 (1982); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980). More subject to doubt, perhaps, are the precise bounds of the category of expression that may be termed commercial speech, but it is clear enough that the speech at issue in this case—advertising pure and simple— falls within those bounds. Our commercial speech doctrine rests heavily on "the 'common-sense' distinction between speech proposing a commercial transaction . . . and other varieties of speech," *Ohralik* v. *Ohio State Bar Assn.*, *supra*, at 455–456, and appellant's advertisements undeniably propose a commercial transaction. Whatever else the category of commercial speech may encompass, see *Central Hudson Gas & Electric Co.* v. *Public Service Comm'n of New York*, *supra*, it must include appellant's advertisements.[7]

---

report of the Board of Bar Commissioners. Thus, the reprimand constituted a public chastisement of appellant for each of the offenses specified. A reprimand that specified fewer infractions would be a different punishment and would be a lesser deterrent to future advertising.

[7] Appellant's advertising contains statements regarding the legal rights of persons injured by the Dalkon Shield that, in another context, would be fully protected speech. That this is so does not alter the status of the advertisements as commercial speech:

"We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 563, n. 5. A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transac-

Our general approach to restrictions on commercial speech is also by now well settled. The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, see *Friedman* v. *Rogers*, 440 U. S. 1 (1979), or that proposes an illegal transaction, see *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U. S. 376 (1973). Commercial speech that is not false or deceptive and does not concern unlawful activities, however, may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest. *Central Hudson Gas & Electric, supra,* at 566. Our application of these principles to the commercial speech of attorneys has led us to conclude that blanket bans on price advertising by attorneys and rules preventing attorneys from using nondeceptive terminology to describe their fields of practice are impermissible, see *Bates* v. *State Bar of Arizona,* 433 U. S. 350 (1977); *In re R. M. J., supra,* but that rules prohibiting in-person solicitation of clients by attorneys are, at least under some circumstances, permissible, see *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447 (1978). To resolve this appeal, we must apply the teachings of these cases to three separate forms of regulation Ohio has imposed on advertising by its attorneys: prohibitions on soliciting legal business through advertisements containing advice and information regarding specific legal problems; restrictions on the use of illustrations in advertising by lawyers; and disclosure requirements relating to the terms of contingent fees.[8]

---

tions. See *ibid.*" *Bolger* v. *Youngs Drug Products Corp.,* 463 U. S. 60, 68 (1983) (footnote omitted).

In this case, Ohio has placed no general restrictions on appellant's right to publish facts or express opinions regarding Dalkon Shield litigation; Ohio's Disciplinary Rules prevent him only from conveying those facts and opinions in the form of advertisements of his services as an attorney.

[8] In its brief on the merits, appellee Office of Disciplinary Counsel advances the surprising contention that the Court ought not permit appellant to raise his constitutional defenses to Ohio's disciplinary proceedings. Ap-

## III

We turn first to the Ohio Supreme Court's finding that appellant's Dalkon Shield advertisement (and his acceptance of employment resulting from it) ran afoul of the rules against self-recommendation and accepting employment resulting from unsolicited legal advice. Because all advertising is at least implicitly a plea for its audience's custom, a broad reading of the rules applied by the Ohio court (and particularly the rule against self-recommendation) might suggest that they forbid all advertising by attorneys—a result obviously not in keeping with our decisions in *Bates* and *In re R. M. J.* But the Ohio court did not purport to give its rules such a broad reading: it held only that the rules forbade soliciting or accepting legal employment through advertisements containing information or advice regarding a specific legal problem.

The interest served by the application of the Ohio self-recommendation and solicitation rules to appellant's advertisement is not apparent from a reading of the opinions of the Ohio Supreme Court and its Board of Commissioners. The advertisement's information and advice concerning the Dalkon Shield were, as the Office of Disciplinary Counsel stipulated, neither false nor deceptive: in fact, they were entirely accurate. The advertisement did not promise readers that

pellee's argument apparently is that because appellant could have challenged the constitutionality of the rules in an action for a declaratory judgment in federal court, he was not entitled to violate them and raise their unconstitutionality defensively. This odd argument stands ordinary jurisprudential principles on their heads. We have often emphasized that, in our federal system, it is preferable that constitutional attacks on state statutes be raised defensively in state-court proceedings rather than in proceedings initiated in federal court. See, *e. g., Younger* v. *Harris,* 401 U. S. 37 (1971). This principle is as applicable to attorney disciplinary proceedings as it is to criminal cases. *Middlesex County Ethics Committee* v. *Garden State Bar Assn.,* 457 U. S. 423 (1982). Accordingly, it was perfectly appropriate for appellant to refrain from an anticipatory challenge to Ohio's rules and to trust that any proceedings the State might initiate would provide a forum in which he could assert his First Amendment rights.

lawsuits alleging injuries caused by the Dalkon Shield would be successful, nor did it suggest that appellant had any special expertise in handling such lawsuits other than his employment in other such litigation.[9]  Rather, the advertisement reported the indisputable fact that the Dalkon Shield has spawned an impressive number of lawsuits[10] and advised readers that appellant was currently handling such lawsuits and was willing to represent other women asserting similar claims.  In addition, the advertisement advised women that they should not assume that their claims were time-barred—advice that seems completely unobjectionable in light of the trend in many States toward a "discovery rule" for determining when a cause of action for latent injury or disease ac-

---

[9] The absence from appellant's advertising of any claims of expertise or promises relating to the quality of appellant's services renders the Ohio Supreme Court's statement that "an allowable restriction for lawyer advertising is that of asserted expertise" beside the point.  Appellant stated only that he had represented other women in Dalkon Shield litigation—a statement of fact not in itself inaccurate.  Although our decisions have left open the possibility that States may prevent attorneys from making non-verifiable claims regarding the quality of their services, see *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 366 (1977), they do not permit a State to prevent an attorney from making accurate statements of fact regarding the nature of his practice merely because it is possible that some readers will infer that he has some expertise in those areas.  See *In re R. M. J.*, 455 U. S. 191, 203–205 (1982).

[10] By 1979, it was "estimated that 2500 claims [had] been made . . . for injuries allegedly caused by [the Dalkon Shield]."  Van Dyke, The Dalkon Shield: A "Primer" in IUD Liability, 6 West. St. U. L. Rev. 1, 3, n. 7 (1978).  By mid-1980, the number of lawsuits had risen to 4,000.  Bamford, Dalkon Shield Starts Losing in Court, 2 American Lawyer 31 (July 1980).  By the end of 1984 it was reported that the manufacturer had settled or satisfied judgments in 6,289 cases and that over 3,600 cases were still pending.  See Robins Mounts Drive to Settle Dalkon Suits, National Law Journal, Dec. 24, 1984, p. 1, col. 3.  Plaintiffs have succeeded in winning favorable settlements and jury verdicts against the Shield's manufacturer.  See, *e. g.*, *Worsham* v. *A. H. Robins Co.*, 734 F. 2d 676 (CA11 1984) (affirming jury verdict); *Gardiner* v. *A. H. Robins Co.*, 747 F. 2d 1180 (CA8 1984) (noting settlement of cases).

crues.[11]  The State's power to prohibit advertising that is "inherently misleading," see *In re R. M. J.*, 455 U. S., at 203, thus cannot justify Ohio's decision to discipline appellant for running advertising geared to persons with a specific legal problem.

Because appellant's statements regarding the Dalkon Shield were not false or deceptive, our decisions impose on the State the burden of establishing that prohibiting the use of such statements to solicit or obtain legal business directly advances a substantial governmental interest.  The extensive citations in the opinion of the Board of Commissioners to our opinion in *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978), suggest that the Board believed that the application of the rules to appellant's advertising served the same interests that this Court found sufficient to justify the ban on in-person solicitation at issue in *Ohralik*.  We cannot agree.  Our decision in *Ohralik* was largely grounded on the substantial differences between face-to-face solicitation and the advertising we had held permissible in *Bates*.  In-person solicitation by a lawyer, we concluded, was a practice rife with possibilities for overreaching, invasion of privacy, the exercise of undue influence, and outright fraud.  *Ohralik*, 436 U. S., at 464–465.  In addition, we noted that in-person solicitation presents unique regulatory difficulties because it is "not visible or otherwise open to public scrutiny."  *Id.*, at 466.  These unique features of in-person solicitation by lawyers, we held, justified a prophylactic rule prohibiting lawyers from engaging in such solicitation for pecuniary gain, but we were careful to point out that "in-person solicitation of

---

[11] In 1983, the Ohio Supreme Court explicitly adopted the rule that "[w]hen an injury does not manifest itself immediately, the cause of action arises upon the date on which the plaintiff is informed by competent medical authority that he has been injured, or upon the date on which, by the exercise of reasonable diligence, he should have become aware that he has been injured, whichever comes first."  *O'Stricker* v. *Jim Walter Corp.*, 4 Ohio St. 3d 84, 90, 447 N. E. 2d 727, 732.

professional employment by a lawyer does not stand on a par with truthful advertising about the availability and terms of routine legal services." *Id.,* at 455.

It is apparent that the concerns that moved the Court in *Ohralik* are not present here. Although some sensitive souls may have found appellant's advertisement in poor taste, it can hardly be said to have invaded the privacy of those who read it. More significantly, appellant's advertisement—and print advertising generally—poses much less risk of over-reaching or undue influence. Print advertising may convey information and ideas more or less effectively, but in most cases, it will lack the coercive force of the personal presence of a trained advocate. In addition, a printed advertisement, unlike a personal encounter initiated by an attorney, is not likely to involve pressure on the potential client for an imme-diate yes-or-no answer to the offer of representation. Thus, a printed advertisement is a means of conveying information about legal services that is more conducive to reflection and the exercise of choice on the part of the consumer than is per-sonal solicitation by an attorney. Accordingly, the substan-tial interests that justified the ban on in-person solicitation upheld in *Ohralik* cannot justify the discipline imposed on appellant for the content of his advertisement.

Nor does the traditional justification for restraints on solicitation—the fear that lawyers will "stir up litigation"— justify the restriction imposed in this case. In evaluating this proffered justification, it is important to think about what it might mean to say that the State has an interest in preventing lawyers from stirring up litigation. It is possible to describe litigation itself as an evil that the State is entitled to combat: after all, litigation consumes vast quantities of so-cial resources to produce little of tangible value but much dis-cord and unpleasantness. "[A]s a litigant," Judge Learned Hand once observed, "I should dread a lawsuit beyond almost anything else short of sickness and death." L. Hand, The Deficiencies of Trials to Reach the Heart of the Matter, in

3 Association of the Bar of the City of New York, Lectures on Legal Topics 89, 105 (1926).

But we cannot endorse the proposition that a lawsuit, as such, is an evil. Over the course of centuries, our society has settled upon civil litigation as a means for redressing grievances, resolving disputes, and vindicating rights when other means fail. There is no cause for consternation when a person who believes in good faith and on the basis of accurate information regarding his legal rights that he has suffered a legally cognizable injury turns to the courts for a remedy: "we cannot accept the notion that it is always better for a person to suffer a wrong silently than to redress it by legal action." *Bates* v. *State Bar of Arizona,* 433 U. S., at 376. That our citizens have access to their civil courts is not an evil to be regretted; rather, it is an attribute of our system of justice in which we ought to take pride. The State is not entitled to interfere with that access by denying its citizens accurate information about their legal rights. Accordingly, it is not sufficient justification for the discipline imposed on appellant that his truthful and nondeceptive advertising had a tendency to or did in fact encourage others to file lawsuits.

The State does not, however, argue that the encouragement of litigation is inherently evil, nor does it assert an interest in discouraging the particular form of litigation that appellant's advertising solicited. Rather, the State's position is that although appellant's advertising may itself have been harmless—may even have had the salutary effect of informing some persons of rights of which they would otherwise have been unaware—the State's prohibition on the use of legal advice and information in advertising by attorneys is a prophylactic rule that is needed to ensure that attorneys, in an effort to secure legal business for themselves, do not use false or misleading advertising to stir up meritless litigation against innocent defendants. Advertising by attorneys, the State claims, presents regulatory difficulties that are different in kind from those presented by other forms of adver-

tising. Whereas statements about most consumer products are subject to verification, the indeterminacy of statements about law makes it impractical if not impossible to weed out accurate statements from those that are false or misleading. A prophylactic rule is therefore essential if the State is to vindicate its substantial interest in ensuring that its citizens are not encouraged to engage in litigation by statements that are at best ambiguous and at worst outright false.

The State's argument that it may apply a prophylactic rule to punish appellant notwithstanding that his particular advertisement has none of the vices that allegedly justify the rule is in tension with our insistence that restrictions involving commercial speech that is not itself deceptive be narrowly crafted to serve the State's purposes. See *Central Hudson Gas & Electric*, 447 U. S., at 565, 569–571. Indeed, in *In re R. M. J.* we went so far as to state that "the States may not place an absolute prohibition on certain types of potentially misleading information . . . if the information also may be presented in a way that is not deceptive." 455 U. S., at 203. The State's argument, then, must be that this dictum is incorrect—that there are some circumstances in which a prophylactic rule is the least restrictive possible means of achieving a substantial governmental interest. Cf. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 467.

We need not, however, address the theoretical question whether a prophylactic rule is ever permissible in this area, for we do not believe that the State has presented a convincing case for its argument that the rule before us is necessary to the achievement of a substantial governmental interest. The State's contention that the problem of distinguishing deceptive and nondeceptive legal advertising is different in kind from the problems presented by advertising generally is unpersuasive.

The State's argument proceeds from the premise that it is intrinsically difficult to distinguish advertisements containing legal advice that is false or deceptive from those that are

truthful and helpful, much more so than is the case with other goods or services.[12]   This notion is belied by the facts before us: appellant's statements regarding Dalkon Shield litigation were in fact easily verifiable and completely accurate.   Nor is it true that distinguishing deceptive from nondeceptive claims in advertising involving products other than legal services is a comparatively simple and straightforward process.   A brief survey of the body of case law that has developed as a result of the Federal Trade Commission's efforts to carry out its mandate under § 5 of the Federal Trade Commission Act to eliminate "unfair or deceptive acts or practices in . . . commerce," 15 U. S. C. § 45(a)(1), reveals that distinguishing deceptive from nondeceptive advertising in virtually any field of commerce may require resolution of exceedingly complex and technical factual issues and the consideration of nice questions of semantics.   See, *e. g., Warner-Lambert Co.* v. *FTC*, 183 U. S. App. D. C. 230, 562 F. 2d 749 (1977); *National Comm'n on Egg Nutrition* v. *FTC*, 570 F. 2d 157 (CA7 1977).   In short, assessment of the validity of legal advice and information contained in attorneys' advertising is

---

[12] The State's argument may also rest in part on a suggestion that even completely accurate advice regarding the legal rights of the advertiser's audience may lead some members of the audience to initiate meritless litigation against innocent defendants.   To the extent that this is the State's contention, it is unavailing.   To be sure, some citizens, accurately informed of their legal rights, may file lawsuits that ultimately turn out not to be meritorious.   But the State is not entitled to prejudge the merits of its citizens' claims by choking off access to information that may be useful to its citizens in deciding whether to press those claims in court.   As we observed in *Bates* v. *State Bar of Arizona*, 433 U. S., at 375, n. 31, if the State's concern is with abuse of process, it can best achieve its aim by enforcing sanctions against vexatious litigation.   In addition, there would be no impediment to a rule forbidding attorneys to use advertisements soliciting clients for nuisance suits—meritless claims filed solely to harass a defendant or coerce a settlement.   Because a client has no legal right to file such a claim knowingly, advertisements designed to stir up such litigation may be forbidden because they propose an "illegal transaction."   See *Pittsburgh Press Co.* v. *Human Relations Comm'n*, 413 U. S. 376 (1973).

not necessarily a matter of great complexity; nor is assessing the accuracy or capacity to deceive of other forms of advertising the simple process the State makes it out to be. The qualitative distinction the State has attempted to draw eludes us.[13]

Were we to accept the State's argument in this case, we would have little basis for preventing the government from suppressing other forms of truthful and nondeceptive advertising simply to spare itself the trouble of distinguishing such advertising from false or deceptive advertising. The First Amendment protections afforded commercial speech would mean little indeed if such arguments were allowed to prevail. Our recent decisions involving commercial speech have been grounded in the faith that the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful. The value of the information presented in appellant's advertising is no less than that contained in other forms of advertising—indeed, insofar as appellant's advertising tended to acquaint persons with their legal rights who might otherwise be shut off from effective access to the legal system, it was undoubtedly more valuable than many other forms of advertising. Prophylactic restraints that would be

---

[13] The American Bar Association evidently shares the view that weeding out false or misleading advertising by attorneys from advertising that is accurate and nonmisleading is neither impractical nor unduly burdensome: the ABA's new Model Rules of Professional Conduct eschew all regulation of the content of advertising that is not "false or misleading." ABA Model Rule of Professional Conduct 7.2 (1983). A recent staff report of the Federal Trade Commission has also concluded that application of a "false or deceptive" standard to attorney advertising would not pose problems distinct from those presented by the regulation of advertising generally. See Federal Trade Commission Staff Report, Improving Consumer Access to Legal Services: The Case for Removing Restrictions on Truthful Advertising 149–155 (1984).

unacceptable as applied to commercial advertising generally are therefore equally unacceptable as applied to appellant's advertising. An attorney may not be disciplined for soliciting legal business through printed advertising containing truthful and nondeceptive information and advice regarding the legal rights of potential clients.

## IV

The application of DR 2–101(B)'s restriction on illustrations in advertising by lawyers to appellant's advertisement fails for much the same reasons as does the application of the self-recommendation and solicitation rules. The use of illustrations or pictures in advertisements serves important communicative functions: it attracts the attention of the audience to the advertiser's message, and it may also serve to impart information directly. Accordingly, commercial illustrations are entitled to the First Amendment protections afforded verbal commercial speech: restrictions on the use of visual media of expression in advertising must survive scrutiny under the *Central Hudson* test. Because the illustration for which appellant was disciplined is an accurate representation of the Dalkon Shield and has no features that are likely to deceive, mislead, or confuse the reader, the burden is on the State to present a substantial governmental interest justifying the restriction as applied to appellant and to demonstrate that the restriction vindicates that interest through the least restrictive available means.

The text of DR 2–101(B) strongly suggests that the purpose of the restriction on the use of illustrations is to ensure that attorneys advertise "in a dignified manner." There is, of course, no suggestion that the illustration actually used by appellant was undignified; thus, it is difficult to see how the application of the rule to appellant in this case directly advances the State's interest in preserving the dignity of attorneys. More fundamentally, although the State undoubtedly

has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights. Even if that were the case, we are unpersuaded that undignified behavior would tend to recur so often as to warrant a prophylactic rule. As we held in *Carey* v. *Population Services International*, 431 U. S. 678, 701 (1977), the mere possibility that some members of the population might find advertising embarrassing or offensive cannot justify suppressing it. The same must hold true for advertising that some members of the bar might find beneath their dignity.

In its arguments before this Court, the State has asserted that the restriction on illustrations serves a somewhat different purpose, akin to that supposedly served by the prohibition on the offering of legal advice in advertising. The use of illustrations in advertising by attorneys, the State suggests, creates unacceptable risks that the public will be misled, manipulated, or confused. Abuses associated with the visual content of advertising are particularly difficult to police, because the advertiser is skilled in subtle uses of illustrations to play on the emotions of his audience and convey false impressions. Because illustrations may produce their effects by operating on a subconscious level, the State argues, it will be difficult for the State to point to any particular illustration and prove that it is misleading or manipulative. Thus, once again, the State's argument is that its purposes can only be served through a prophylactic rule.

We are not convinced. The State's arguments amount to little more than unsupported assertions: nowhere does the State cite any evidence or authority of any kind for its contention that the potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban. Moreover, none of the

State's arguments establish that there are particular evils associated with the use of illustrations in attorneys' advertisements. Indeed, because it is probably rare that decisions regarding consumption of legal services are based on a consumer's assumptions about qualities of the product that can be represented visually, illustrations in lawyer's advertisements will probably be less likely to lend themselves to material misrepresentations than illustrations in other forms of advertising.

Thus, acceptance of the State's argument would be tantamount to adoption of the principle that a State may prohibit the use of pictures or illustrations in connection with advertising of any product or service simply on the strength of the general argument that the visual content of advertisements may, under some circumstances, be deceptive or manipulative. But as we stated above, broad prophylactic rules may not be so lightly justified if the protections afforded commercial speech are to retain their force. We are not persuaded that identifying deceptive or manipulative uses of visual media in advertising is so intrinsically burdensome that the State is entitled to forgo that task in favor of the more convenient but far more restrictive alternative of a blanket ban on the use of illustrations. The experience of the FTC is, again, instructive. Although that agency has not found the elimination of deceptive uses of visual media in advertising to be a simple task, neither has it found the task an impossible one: in many instances, the agency has succeeded in identifying and suppressing visually deceptive advertising. See, e. g., FTC v. Colgate-Palmolive Co., 380 U. S. 374 (1965). See generally E. Kintner, A Primer on the Law of Deceptive Practices 158–173 (2d ed. 1978). Given the possibility of policing the use of illustrations in advertisements on a case-by-case basis, the prophylactic approach taken by Ohio cannot stand; hence, appellant may not be disciplined for his use of an accurate and nondeceptive illustration.

## V

Appellant contends that assessing the validity of the Ohio Supreme Court's decision to discipline him for his failure to include in the Dalkon Shield advertisement the information that clients might be liable for significant litigation costs even if their lawsuits were unsuccessful entails precisely the same inquiry as determining the validity of the restrictions on advertising content discussed above. In other words, he suggests that the State must establish either that the advertisement, absent the required disclosure, would be false or deceptive or that the disclosure requirement serves some substantial governmental interest other than preventing deception; moreover, he contends that the State must establish that the disclosure requirement directly advances the relevant governmental interest and that it constitutes the least restrictive means of doing so. Not surprisingly, appellant claims that the State has failed to muster substantial evidentiary support for any of the findings required to support the restriction.

Appellant, however, overlooks material differences between disclosure requirements and outright prohibitions on speech. In requiring attorneys who advertise their willingness to represent clients on a contingent-fee basis to state that the client may have to bear certain expenses even if he loses, Ohio has not attempted to prevent attorneys from conveying information to the public; it has only required them to provide somewhat more information than they might otherwise be inclined to present. We have, to be sure, held that in some instances compulsion to speak may be as violative of the First Amendment as prohibitions on speech. See, e. g., *Wooley* v. *Maynard*, 430 U. S. 705 (1977); *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974). Indeed, in *West Virginia State Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943), the Court went so far as to state that "involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." *Id.*, at 633.

But the interests at stake in this case are not of the same order as those discussed in *Wooley, Tornillo,* and *Barnette.* Ohio has not attempted to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U. S., at 642. The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available. Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, see *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748 (1976), appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal. Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, "warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception." *In re R. M. J.,* 455 U. S., at 201. Accord, *Central Hudson Gas & Electric,* 447 U. S., at 565; *Bates* v. *State Bar of Arizona,* 433 U. S., at 384; *Virginia Pharmacy Bd., supra,* at 772, n. 24.

We do not suggest that disclosure requirements do not implicate the advertiser's First Amendment rights at all. We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers.[14]

---

[14] We reject appellant's contention that we should subject disclosure requirements to a strict "least restrictive means" analysis under which they

The State's application to appellant of the requirement that an attorney advertising his availability on a contingent-fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful (assuming that to be the case) easily passes muster under this standard. Appellant's advertisement informed the public that "if there is no recovery, no legal fees are owed by our clients." The advertisement makes no mention of the distinction between "legal fees" and "costs," and to a layman not aware of the meaning of these terms of art, the advertisement would suggest that employing appellant would be a no-lose proposition in that his representation in a losing cause would come entirely free of charge. The assumption that substantial numbers of potential clients would be so misled is hardly a speculative one: it is a commonplace that members of the public are often unaware of the technical meanings of such terms as "fees" and "costs"—terms that, in ordinary usage, might well be virtually interchangeable. When the possibility of deception is as self-evident as it is in this case, we need not require

must be struck down if there are other means by which the State's purposes may be served. Although we have subjected outright prohibitions on speech to such analysis, all our discussions of restraints on commercial speech have recommended disclosure requirements as one of the acceptable less restrictive alternatives to actual suppression of speech. See, e. g., *Central Hudson Gas & Electric,* 447 U. S., at 565. Because the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed, we do not think it appropriate to strike down such requirements merely because other possible means by which the State might achieve its purposes can be hypothesized. Similarly, we are unpersuaded by appellant's argument that a disclosure requirement is subject to attack if it is "underinclusive"—that is, if it does not get at all facets of the problem it is designed to ameliorate. As a general matter, governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied. See, e. g., *Zablocki* v. *Redhail,* 434 U. S. 374, 390 (1978). The right of a commercial speaker not to divulge accurate information regarding his services is not such a fundamental right.

the State to "conduct a survey of the . . . public before it [may] determine that the [advertisement] had a tendency to mislead." *FTC* v. *Colgate-Palmolive Co.*, 380 U. S., at 391–392. The State's position that it is deceptive to employ advertising that refers to contingent-fee arrangements without mentioning the client's liability for costs is reasonable enough to support a requirement that information regarding the client's liability for costs be disclosed.[15]

---

[15] Appellant suggests that the disclosures required by the Ohio Supreme Court would in fact be unduly burdensome and would tend to chill advertising of contingent-fee arrangements. Evaluation of this claim is somewhat difficult in light of the Ohio court's failure to specify precisely what disclosures were required. The gist of the report of the Board of Commissioners on this point, however, was that appellant's advertising was potentially deceptive because it "left standing the impression that if there were no recovery, the client would owe nothing." App. to Juris. Statement 14a. Accordingly, the report at a minimum suggests that an attorney advertising a contingent fee must disclose that a client may be liable for costs even if the lawsuit is unsuccessful. The report and the opinion of the Ohio Supreme Court also suggest that the attorney's contingent-fee rate must be disclosed, see *ibid.;* 10 Ohio St. 3d 44, 48, 461 N. E. 2d 883, 886 (1984). Neither requirement seems intrinsically burdensome; and they certainly cannot be said to be unreasonable as applied to appellant, who included in his advertisement no information whatsoever regarding costs and fee rates. This case does not provide any factual basis for finding that Ohio's disclosure requirements are unduly burdensome.

The vagueness of the Ohio Supreme Court's opinion regarding precisely what an attorney must disclose in an advertisement mentioning a contingent fee is, however, unfortunate. It is also worth noting that DR 2–101(B)(15), the only explicit reference in the Ohio rules to a disclosure requirement involving contingent fees, does not on its face require any disclosures except when an advertisement mentions contingent-fee *rates*— which appellant's advertisement did not do. Because "[a] relevant inquiry in appraising a decision to disbar is whether the attorney stricken from the rolls can be deemed to have been on notice that the courts would condemn the conduct for which he was removed," *In re Ruffalo*, 390 U. S. 544, 554 (1968) (WHITE, J., concurring in result), it may well be that for Ohio actually to disbar an attorney on the basis of its disclosure requirements as they have been worked out to this point would raise significant due process concerns. Given the reasonableness of the decision that appellant's omis-

## VI

Finally, we address appellant's argument that he was denied procedural due process by the manner in which discipline was imposed on him in connection with his drunken driving advertisement. Appellant's contention is that the theory relied on by the Ohio Supreme Court and its Board of Commissioners as to how the advertisement was deceptive was different from the theory asserted by the Office of Disciplinary Counsel in its complaint.[16] We cannot agree that this discrepancy violated the constitutional guarantee of due process.

Under the law of Ohio, bar discipline is the responsibility of the Ohio Supreme Court. Ohio Const., Art. IV, § 2(B)(1)(g). The Board of Commissioners on Grievances and Discipline formally serves only as a body that recommends discipline to the Supreme Court; it has no authority to impose discipline itself. See Govt. Bar Rule V(2), (16)–(20). That the Board of Commissioners chose to make its recommendation of discipline on the basis of reasoning different from that of the Office of Disciplinary Counsel is of little moment: what is important is that the Board's recommendations put appellant on notice of the charges he had to answer to the satisfaction of the Supreme Court of Ohio. Appellant does not contend that he was afforded no opportunity to respond to the Board's recommendation; indeed, the Ohio rules appear to provide ample opportunity for response to Board recommendations, and it appears that appellant availed himself of that opportu-

---

sions created the potential for deception of the public, however, we see no infirmity in a decision to issue a public reprimand on the basis of those omissions. And, of course, were Ohio to articulate its disclosure rules regarding contingent fees in such a way that they provided a sure guide to the advertising attorney, neither the Due Process Clause nor the First Amendment would preclude disbarment as a penalty for the violation of those rules.

[16] See *supra,* at 634.

nity.[17]   The notice and opportunity to respond afforded appellant were sufficient to satisfy the demands of due process.[18]

## VII

The Supreme Court of Ohio issued a public reprimand incorporating by reference its opinion finding that appellant had violated Disciplinary Rules 2–101(A), 2–101(B), 2–101 (B)(15), 2–103(A), and 2–104(A).   That judgment is affirmed to the extent that it is based on appellant's advertisement involving his terms of representation in drunken driving cases and on the omission of information regarding his contingent-fee arrangements in his Dalkon Shield advertisement.   But insofar as the reprimand was based on appellant's use of an

---

[17] Appellant suggests that he was prejudiced by his inability to present evidence relating to the Board's factual conclusion that it was a common practice for persons charged with drunken driving to plead guilty to lesser offenses.   If this were in fact the case, appellant's due process objection might be more forceful.   But appellant does not—and probably cannot— seriously dispute that guilty pleas to lesser offenses are common in drunken driving cases, nor does he argue that he was precluded from arguing before the Ohio Supreme Court that it was improper for the Board of Commissioners to take judicial notice of the prevalence of such pleas.   Under these circumstances, we see no violation of due process in the Ohio Supreme Court's acceptance of the Board's factual conclusions.   See *American Trucking Assns., Inc.* v. *Frisco Transportation Co.*, 358 U. S. 133, 144 (1958).

[18] Appellant's reliance on *In re Ruffalo*, 390 U. S. 544 (1968), is misplaced.   Although the majority in that case did hold that a change in the charges against the petitioner during proceedings before the Ohio Board of Commissioners violated due process, the feature of that case that was particularly offensive was that the change was such that the very evidence put on by the petitioner in defense of the original charges became, under the revised charges, inculpatory.   Thus, in that case, the original charges functioned as a "trap," *id.*, at 551, for they lulled the petitioner into presenting evidence that "irrevocably assur[ed] his disbarment under charges not yet made." *Id.*, at 551, n. 4.   In this case, the variance between the theory of the Office of Disciplinary Counsel and the Board of Commissioners had no such prejudicial effect on appellant.

illustration in his advertisement in violation of DR 2–101(B) and his offer of legal advice in his advertisement in violation of DR 2–103(A) and 2–104(A), the judgment is reversed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part, concurring in the judgment in part, and dissenting in part.

I fully agree with the Court that a State may not discipline attorneys who solicit business by publishing newspaper advertisements that contain "truthful and nondeceptive information and advice regarding the legal rights of potential clients" and "accurate and nondeceptive illustration[s]." *Ante*, at 647, 649. I therefore join Parts I–IV of the Court's opinion, and I join the Court's judgment set forth in Part VII to the extent it reverses the Supreme Court of Ohio's public reprimand of the appellant Philip Q. Zauderer for his violations of Disciplinary Rules 2–101(B), 2–103(A), and 2–104(A).

With some qualifications, I also agree with the conclusion in Part V of the Court's opinion that a State may impose commercial-advertising disclosure requirements that are "reasonably related to the State's interest in preventing deception of consumers." *Ante*, at 651. I do not agree, however, that the State of Ohio's vaguely expressed disclosure requirements fully satisfy this standard, and in any event I believe that Ohio's punishment of Zauderer for his alleged infractions of those requirements violated important due process and First Amendment guarantees. In addition, I believe the manner in which Ohio has punished Zauderer for publishing the "drunk driving" advertisement violated fundamental principles of procedural due process. I therefore concur in part and dissent in part from Part V of the Court's opinion, dissent from Part VI, and dissent from the judgment set forth in Part VII insofar as it affirms the Supreme Court

of Ohio's public reprimand "based on appellant's advertisement involving his terms of representation in drunken driving cases and on the omission of information regarding his contingent-fee arrangements in his Dalkon Shield advertisement." *Ante*, at 655.

# I

## A

The Court concludes that the First Amendment's protection of commercial speech is satisfied so long as a disclosure requirement is "reasonably related" to preventing consumer deception, and it suggests that this standard "might" be violated if a disclosure requirement were "unjustified" or "unduly burdensome." *Ante*, at 651. I agree with the Court's somewhat amorphous "reasonable relationship" inquiry only on the understanding that it comports with the standards more precisely set forth in our previous commercial-speech cases. Under those standards, regulation of commercial speech—whether through an affirmative disclosure requirement or through outright suppression[1]—is "reasonable" only

---

[1] Much of the Court's reasoning appears to rest on the premise that, in the commercial-speech context, "the First Amendment interests implicated by disclosure requirements are substantially weaker than those at stake when speech is actually suppressed." *Ante*, at 652, n. 14. I believe the Court greatly overstates the distinction between disclosure and suppression in these circumstances. We have noted in traditional First Amendment cases that an affirmative publication requirement "operates as a command in the same sense as a statute or regulation forbidding [someone] to publish specified matter," and that "a compulsion to publish that which '"reason" tells [one] should not be published'" therefore raises substantial First Amendment concerns. *Miami Herald Publishing Co. v. Tornillo*, 418 U. S. 241, 256 (1974). Such compulsion in the advertising context will frequently be permissible, and I agree that the distinction between suppression and disclosure supports some differences in analysis. See n. 2, *infra*. Nevertheless, disclosure requirements must satisfy the basic tenets of commercial-speech doctrine: they must demonstrably and directly advance substantial state interests, and they may extend no further than "reasonably necessary" to serve those interests. *In re R. M. J.*, 455 U. S. 191, 203 (1982); *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U. S. 557, 564–565 (1980).

to the extent that a State can demonstrate a legitimate and substantial interest to be achieved by the regulation.  *In re R. M. J.*, 455 U. S. 191, 203 (1982); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 564 (1980).  Moreover, the regulation must directly advance the state interest and "may extend only as far as the interest it serves."  *Id.*, at 565.  See also *id.*, at 564 ("[T]he regulatory technique must be in proportion to [the State's] interest").  Where the State imposes regulations to guard against "the potential for deception and confusion" in commercial speech, those regulations "may be no broader than reasonably necessary to prevent the deception."  *In re R. M. J.*, *supra*, at 203.  See also *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 772, n. 24 (1976) (disclosure requirements are permissible only to the extent they "are necessary to prevent [the advertisement from] being deceptive"); *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 384 (1977) (States may require "some *limited* supplementation . . . so as to assure that the consumer is not misled") (emphasis added).[2]

Because of the First Amendment values at stake, courts must exercise careful scrutiny in applying these standards. Thus a State may not rely on "highly speculative" or "tenu-

---

[2] I agree that Zauderer's "least restrictive means" analysis is misconceived in the context of commercial-speech disclosure requirements.  See *ante*, at 651–652, n. 14.  Zauderer argues that Ohio's interest in preventing consumer deception could more effectively be achieved through direct regulation of contingent-fee agreements themselves rather than through compelled disclosures in advertising.  Brief for Appellant 41–43.  As we repeatedly have emphasized, however, States have a substantial interest in ensuring that advertising *itself* is not misleading, see *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 771–772, and regulation of the underlying substantive conduct does not remove the potential for deception in the body of the advertisement. Beyond this, however, a disclosure requirement is "reasonably related" to truth in advertising only to the extent that it satisfies the standards set forth above in text.

ous" arguments in carrying its burden of demonstrating the legitimacy of its commercial-speech regulations. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York, supra,* at 569. Where a regulation is addressed to allegedly deceptive advertising, the State must instead demonstrate that the advertising either "is inherently likely to deceive" or must muster record evidence showing that "a particular form or method of advertising has in fact been deceptive," *In re R. M. J., supra,* at 202, and it must similarly demonstrate that the regulations directly and proportionately remedy the deception. Where States have failed to make such showings, we have repeatedly struck down the challenged regulations.[3]

As the Court acknowledges, it is "somewhat difficult" to apply these standards to Ohio's disclosure requirements "in light of the Ohio court's failure to specify precisely what disclosures were required." *Ante,* at 653, n. 15. It is also somewhat difficult to determine precisely what disclosure requirements the Court approves today. The Supreme Court of Ohio appears to have imposed three overlapping requirements, each of which must be analyzed under the First

---

[3] See, *e. g., In re R. M. J., supra,* at 200, n. 11 (State must justify restriction in light of "experience"); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York, supra,* at 570; *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 381 (1977); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 95 (1977) ("The record here demonstrates that respondents failed to establish that [their restriction] is needed"); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc., supra,* at 769 (Commonwealth's justifications failed on "close inspection"). See also *Metromedia, Inc.* v. *San Diego,* 453 U. S. 490, 528 (1981) (BRENNAN, J., concurring in judgment). In evaluating the necessary form and content of disclosure, courts of course should be guided by the "enlightenment gained from administrative experience," because regulatory authorities are "often in a better position than are courts to determine" such matters. *FTC* v. *Colgate-Palmolive Co.,* 380 U. S. 374, 385 (1965); cf. *In re R. M. J., supra,* at 200, n. 11. Particularly in this First Amendment context, however, such determinations merit deference only to the extent they are supported by evidence and reasoned explanation.

Amendment standards set forth above.   First, the court con-
cluded that "a lawyer advertisement which refers to contin-
gent fees" should indicate whether "additional costs . . .
might be assessed the client."   10 Ohio St. 3d 44, 48, 461
N. E. 2d 883, 886 (1984).   The report of the Board of Com-
missioners on Grievances and Discipline of the Ohio Supreme
Court explained that such a requirement is necessary to
guard against "the impression that if there were no recovery,
the client would owe nothing."   App. to Juris. Statement
14a.   I agree with the Court's conclusion that, given the gen-
eral public's unfamiliarity with the distinction between fees
and costs, a State may require an advertising attorney to in-
clude a costs disclaimer so as to avoid the potential for misun-
derstanding, *ante*, at 653—provided the required disclaimer
is "no broader than reasonably necessary to prevent the de-
ception," *In re R. M. J.*, *supra*, at 203.

Second, the report and opinion provide that an attorney
advertising his availability on a contingent-fee basis must
"specifically expres[s]" his rates.   10 Ohio St. 3d, at 48, 461
N. E. 2d, at 886; see also App. to Juris. Statement 14a.   The
Court's analysis of this requirement—which the Court char-
acterizes as a "suggest[ion]," *ante*, at 653, n. 15—is limited
to the passing observation that the requirement does not
"see[m] intrinsically burdensome," *ibid.*   The question of
burden, however, is irrelevant unless the State can first
demonstrate that the rate-publication requirement directly
and proportionately furthers a "substantial interest."   *In re
R. M. J.*, 455 U. S., at 203.   Yet an attorney's failure to
specify a particular percentage rate when advertising that he
accepts cases on a contingent-fee basis can in no way be said
to be "inherently likely to deceive," *id.*, at 202, and the volu-
minous record in this case fails to reveal a single instance sug-
gesting that such a failure has in actual experience proved
deceptive.[4]   Nor has Ohio at any point identified any other

---

[4] The Office of Disciplinary Counsel introduced no evidence and made no
arguments concerning this question, and the Board of Commissioners did

"substantial interest" that would be served by such a requirement. Although a State might well be able to demonstrate that rate publication is necessary to prevent deception or to serve some other substantial interest, it must do so pursuant to the carefully structured commercial-speech standards in order to ensure the full evaluation of competing considerations and to guard against impermissible discrimination among different categories of commercial speech.  See n. 7, *infra*.[5]  Ohio has made no such demonstration here.

Third, the Supreme Court of Ohio agreed with the Board of Commissioners that Zauderer had acted unethically "by failing *fully* to disclose the terms of the contingent fee arrangement which was intended to be entered into at the time of publishing the advertisement."  10 Ohio St. 3d, at 47, 461

not address the issue.  The Supreme Court of Ohio referred in passing to rate disclosure as contributing to "purposes of clarity."  10 Ohio St. 3d 44, 48, 461 N. E. 2d 883, 886 (1984).  But there is nothing in this record to suggest that a simple reference to contingent fees is unclear, and such cursory and "highly speculative" arguments are an unacceptable substitute for the reasoned evaluation that is required when regulating commercial speech.  *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 569; see also *Bates* v. *State Bar of Arizona, supra*, at 381.

[5] Ohio's failure to make such a demonstration is particularly troubling in light of Zauderer's persuasive argument that it is extremely burdensome—and in fact potentially misleading—to attempt to set forth a particular advertised "rate" for personal injury cases.  He argues that his contingent-fee rates—like those of many attorneys—vary substantially depending upon the unique factual and legal needs of a given client and the extent of representation that is necessary to advance the client's interests. Zauderer's specific rate information is subject to numerous qualifications and clarifications, all of which are spelled out in a lengthy written contract. See n. 6, *infra.*  It was precisely out of concern that a set "rate" might not accurately encompass the range of potentially required services that some Members of this Court objected to *any* price disclosure by attorneys in the first instance.  See, *e. g., Bates* v. *State Bar of Arizona*, 433 U. S., at 386 (BURGER, C. J., concurring in part and dissenting in part); *id.*, at 392 (POWELL, J., concurring in part and dissenting in part).  Our approval of attorney price advertising has previously extended only to those services for which fixed rates can "meaningfully be established."  *Id.*, at 373.

N. E. 2d, at 886 (emphasis added); see App. to Juris. Statement 14a, 19a. The record indicates that Zauderer enters into a comprehensive contract with personal injury clients, one that spells out over several pages the various terms and qualifications of the contingent-fee relationship.[6]  If Ohio

---

[6] A representative "Retainer Agreement and Contract of Employment" provides, *inter alia:*

"IV. *ATTORNEY FEES*

"I hereby agree to pay P. Q. Z. & A as attorney fees for such representation, which fees are deemed by me to be reasonable:

"*Thirty-Three and One-Third Per Cent* of the gross amount recovered by way of settlement or compromise prior to trial;

"*Forty Per Cent* of the gross amount recovered by way of settlement or compromise or judgment if a trial or any part thereof commences, and an appeal is not necessary;

"*Forty-Five Per Cent* of the gross amount recovered by way of settlement or compromise or judgment if a trial or any part thereof commences, and an appeal is necessary.

"The term 'gross amount' shall mean the total amount of money recovered, prior to any deduction for expenses, and shall include any interest awarded or recovered.

"IT IS AGREED AND UNDERSTOOD THAT THIS EMPLOYMENT IS UPON A CONTINGENT FEE BASIS, AND IF NO RECOVERY IS MADE, I WILL NOT BE INDEBTED TO P. Q. Z. & A FOR ANY SUM WHATSOEVER AS ATTORNEY FEES *(EXCEPT AS PROVIDED IN SECTION VIII HEREOF.)*

"V. *COSTS AND OTHER EXPENSES*

"I understand and agree that out-of-pocket costs incurred or advanced by P. Q. Z. & A in the course of the investigation or in the handling of any litigation or appeal on my behalf including, but not limited to, court costs, long distance telephone charges, court costs, document duplication costs, brief printing costs, postage, court reporter fees, medical report expenses, witness fees, costs of obtaining evidence, necessary disbursements and reasonable travel expenses incurred by P. Q. Z. & A in advancing my cause, must be borne by me.   I, thus, agree to reimburse P. Q. Z. & A for any such necessary out-of-pocket expenses it advances on my behalf.

"VI. *EMPLOYMENT OF EXPERTS AND INVESTIGATORS*

"P. Q. Z. & A may, in its discretion, employ medical experts or other necessary experts or investigators in connection with my case, after consultation with me.

seriously means to require Zauderer "fully to disclose the[se] terms," this requirement would obviously be so "unduly burdensome" as to violate the First Amendment. *Ante,* at 651. Such a requirement, compelling the publication of detailed fee information that would fill far more space than the advertisement itself, would chill the publication of protected commercial speech and would be entirely out of proportion

"I understand that all fees and expenses charged by such experts, including witness fees, are my responsibility, and I agree to reimburse P. Q. Z. & A for any such fees or expenses which it advances or incurs on my behalf.

"VI. *ASSOCIATE COUNSEL AND LEGAL ASSISTANTS*

"P. Q. Z. & A may, in its discretion, employ associate counsel (including one or more lawyers outside the office of P. Q. Z. & A) and law clerks or legal assistants or paralegals to assist it in representing me. The cost of such assistance shall be borne by P. Q. Z. & A out of the attorney fees, if any, paid under Section IV of this contract. (I understand that if P. Q. Z. & A employs associate counsel, a division of attorney fees, if any, paid under Section IV will be made, and I hereby consent to such employment and division of fees).

"VII. *RETENTION OF ATTORNEY'S FEES AND ADVANCED COSTS FROM SETTLEMENT PROCEEDS*

"P. Q. Z. & A may receive the settlement or judgment amount and may retain its percentage of attorney's fees from such sum. Before disbursing the remainder to me, it may deduct therefrom the amount of costs and expenses advanced or incurred by P. Q. Z. & A as herein provided.

"VIII. *SUBSTITUTION OR DISCHARGE OF ATTORNEY*

"P. Q. Z. & A shall be entitled to the reasonable value of its professional services (and its costs and other expenses as provided in Sections V and VI) in the event I discharge P. Q. Z. & A or obtain a substitution of attorneys before any settlement, compromise or judgment on any claim for the prosecution of which P. Q. Z. & A is hereby retained.

. . . . .

"X. *COMPENSATION IN EVENT OF SETTLEMENT BY CLIENT*

"I agree that if I settle my claim or cause of action without the consent of P. Q. Z. & A, I will pay to P. Q. Z. & A: (a) the fee computed in accordance with the terms of this agreement, based upon the final recovery received by me in the settlement, and (b) the costs and expenses as provided in Section V and VI." Attachment A to Response of Respondent Zauderer to Relator's First Set of Interrogatories, No. 454 (Bd. of Commr's on Grievances and Discipline, S. Ct. Ohio).

to the State's legitimate interest in preventing potential deception. See *In re R. M. J.*, 455 U. S., at 203; *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 564; *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S., at 771–772, n. 24. Given the Court's explicit endorsement of Ohio's other disclosure provisions, I can only read the Court's telling silence respecting this apparent requirement as an implicit acknowledgment that it could not possibly pass constitutional muster.[7]

## B

Ohio's glaring failure "to specify precisely what disclosures were required," *ante*, at 653, n. 15, is relevant in another important respect. Even if a State may impose particular disclosure requirements, an advertiser may not be punished for failing to include such disclosures "unless his failure is in violation of valid state statutory or decisional law requiring the [advertiser] to label or take other precautions to prevent confusion of customers." *Compco Corp.* v. *Day-Brite Lighting, Inc.*, 376 U. S. 234, 238–239 (1964). Whether or not Ohio *may* properly impose the disclosure requirements discussed above, it failed to provide Zauderer with sufficient notice that he was expected to include such disclosures in his Dalkon Shield advertisement. The State's punishment of Zauderer therefore violated basic due process and First Amendment guarantees.

---

[7] Ohio apparently imposes no comparably sweeping disclosure requirements on advertisements that mention other types of fee arrangements, such as hourly rates or fixed-fee schedules. Cf. Ohio DR 2–101(B) (16)–(17). In the absence of any evidence supporting such extremely disparate treatment—and there is none in this record—one inference might be that contingent-fee advertising is being impermissibly singled out for onerous treatment. Cf. *Friedman* v. *Rogers*, 440 U. S. 1, 20–24 (1979) (BLACKMUN, J., concurring in part and dissenting in part); *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 475–476 (1978) (MARSHALL, J., concurring in part and concurring in judgment).

Neither the published rules, state authorities, nor governing precedents put Zauderer on notice of what he was required to include in the advertisement. As the Court acknowledges, Ohio's Disciplinary Rules do not "on [their] face require any disclosures except when an advertisement mentions contingent-fee *rates*—which appellant's advertisement did not do." *Ante*, at 653, n. 15. In light of the ambiguity of the rules, Zauderer contacted the governing authorities *before* publishing the advertisement and unsuccessfully sought to determine whether it would be ethically objectionable. He met with representatives of the Office of Disciplinary Counsel, reviewed the advertisement with them, and asked whether the Office had any objections or recommendations concerning the form or content of the advertisement. The Office refused to advise Zauderer whether "he should or should not publish the advertisement," informing him that it "does not have authority to issue advisory opinions nor to approve or disapprove legal service advertisements." Stipulation of Fact Between Relator and Respondent ¶¶ 22, 27, App. 16. And even after full disciplinary proceedings, Ohio still has failed, as the Court acknowledges, "to specify precisely what disclosures were required," and therefore to specify precisely how Zauderer violated the law and what reasonable precautions he can take to avoid future disciplinary actions. *Ante*, at 653, n. 15.

A regulation that "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926). The Fourteenth Amendment's Due Process Clause "insist[s] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned* v. *City of Rockford*, 408 U. S. 104, 108–109 (1972). This requirement "applies with particular force in review of laws dealing with speech," *Hynes*

v. *Mayor of Oradell,* 425 U. S. 610, 620 (1976); "a man may be the less required to act at his peril here, because the free dissemination of ideas may be the loser," *Smith* v. *California,* 361 U. S. 147, 151 (1959).[8]

These guarantees apply fully to attorney disciplinary proceedings. *In re Ruffalo,* 390 U. S. 544, 550 (1968). Given the traditions of the legal profession and an attorney's specialized professional training, there is unquestionably some room for enforcement of standards that might be impermissibly vague in other contexts; an attorney in many instances may properly be punished for "conduct which all responsible attorneys would recognize as improper for a member of the profession." *Id.,* at 555 (WHITE, J., concurring in result).[9] But where "[t]he appraisal of [an attorney's] conduct is one about which reasonable men differ, not one immediately apparent to any scrupulous citizen who confronts the question," and where the State has not otherwise proscribed the conduct in reasonably clear terms, the Due Process Clause forbids punishment of the attorney for that conduct. *Id.,* at 555–556.[10]

---

[8] See also *Buckley* v. *Valeo,* 424 U. S. 1, 76–82 (1976) *(per curiam); Baggett* v. *Bullitt,* 377 U. S. 360, 372 (1964); *Cramp* v. *Board of Public Instruction,* 368 U. S. 278, 287 (1961).

[9] Arguably vague regulations may take on "definiteness and clarity" in the context of the profession's "complex code of behavior," and an attorney is properly charged with knowledge of all applicable disciplinary rules and ethical guidelines. *In re Bithoney,* 486 F. 2d 319, 324–325 (CA1 1973). See also Comment, ABA Code of Professional Responsibility: Void for Vagueness?, 57 N. C. L. Rev. 671, 676–680 (1979).

[10] In addition to ensuring fair notice, vagueness doctrine also guards against "'harsh and discriminatory enforcement . . . against particular groups deemed to merit [official] displeasure.'" *Papachristou* v. *City of Jacksonville,* 405 U. S. 156, 170 (1972) (citation omitted); see also *Kolender* v. *Lawson,* 461 U. S. 352, 358 (1983). Some commentators have suggested that vague disciplinary rules have been used as a tool for singling out unorthodox and unpopular attorneys for sanction. See, *e. g.,* Comment, Controlling Lawyers by Bar Associations and Courts,

I do not believe that Zauderer's Dalkon Shield advertisement can be said to be so obviously misleading as to justify punishment in the absence of a reasonably clear contemporaneous rule requiring the inclusion of certain disclaimers. The advertisement's statement that "[i]f there is no recovery, no legal fees are owed by our clients" was accurate on its face, and "[t]here is nothing in the record to indicate that the inclusion of this information was misleading" in actual practice because of the failure to include a costs disclaimer. *In re R. M. J.*, 455 U. S., at 205–206.[11] Moreover, although the statement might well be viewed by many attorneys as carrying the potential for deception, the Office of Disciplinary Counsel itself *stipulated* that "[t]he Dalkon Shield advertisement published by [Zauderer] does not contain a false, fraudulent, misleading, deceptive, self-laudatory or unfair statement or claim." Stipulation of Fact Between Relator and Respondent ¶ 30, App. 17. Several other States have approved the publication of Dalkon Shield advertisements containing the *identical* no-legal-fees statement, without even a suggestion that the statement might be deceptive.[12]

---

5 Harv. Civ. Rights-Civ. Lib. L. Rev. 301, 312–314 (1970); Comment, The Privilege Against Self-Incrimination in Bar Disciplinary Proceedings: What Ever Happened to *Spevak?*, 23 Vill. L. J. 127, 135–136 (1977). See also n. 11, *infra*.

[11] No member of the general public has ever complained to the Office of Disciplinary Counsel about Zauderer's Dalkon Shield advertisement. Second Stipulation of Fact Between Relator and Respondent ¶ 38, App. 41. Instead, the Office filed its charges only as a result of complaints received from other attorneys—including the local counsel for A. H. Robins Company, manufacturer of the Dalkon Shield. *Id.*, ¶¶ 39, 40, App. 41.

[12] See, *e. g.*, Brief for Respondent Zauderer In Support Of His Objections, No. DD 83–19 (S. Ct. Ohio), pp. 129–130 (decision of the Disciplinary Board of the Supreme Court of Pennsylvania); *id.*, at 132 (decision of the State Disciplinary Board of the State Bar of Georgia); *id.*, at 135 (decision of the Florida Bar Grievance Committee for the Tenth Judicial Circuit); Statement of Additional Authorities Upon Which Counsel For Respondent Zauderer Intends To Rely, No. DD 83–19 (S. Ct. Ohio), pp. 15–16 (decision

And the Office of Disciplinary Counsel's refusal to respond to Zauderer's prepublication inquiries concerning the propriety of the advertisement wholly undermines one of the basic justifications for allowing punishment for violations of imprecise commercial regulations—that a businessperson can clarify the meaning of an arguably vague regulation by consulting with government administrators.[13]  Although I agree that a State may upon a proper showing require a costs disclaimer as a prophylactic measure to guard against potential deception, see *supra*, at 660, and may thereafter discipline attorneys who fail to include such disclaimers, Ohio had imposed no such requirement at the time Zauderer published the advertisement, as the Court acknowledges, *ante*, at 653, n. 15. The State instead has punished Zauderer for violating requirements that did not exist prior to this disciplinary proceeding.

The Court appears to concede these serious problems, noting that "it may well be that for Ohio actually to *disbar* an attorney on the basis of its disclosure requirements as they have been worked out to this point would raise significant due process concerns." *Ibid.* (emphasis added).  The Court

---

of the Office of Trial Counsel, State Bar of California); *In re Discipline of Appert & Pyle*, 315 N. W. 2d 204 (Minn. 1981).

The Office of Disciplinary Counsel apparently did not initially view the no-legal-fees statement as deceptive, because it did not so charge until almost five months *after* the proceedings had commenced.  Compare Complaint and Certificate, App. 3, with Amended Complaint ¶¶ 24–27, App. 25. As Zauderer notes, "the fact that the charge was not made in the original complaint suggests that if appellee found the ad misleading, it was only after several readings of both the ad and the Code that it reached this conclusion."  Brief for Appellant 38.

[13] See, *e. g.*, *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982); *Joseph E. Seagram & Sons, Inc.* v. *Hostetter*, 384 U. S. 35, 49 (1966).  The Court previously has noted that, because traditional prior restraint principles do not fully apply to commercial speech, a State may require "a system of previewing advertising campaigns to insure that they will not defeat" state restrictions.  *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S., at 571, n. 13.

"see[s] no infirmity" in this case, however, because the Supreme Court of Ohio publicly reprimanded Zauderer rather than disbarring him. *Ante,* at 654, n. 15. This distinction is thoroughly unconvincing. When an attorney's constitutional rights have been violated, we have not hesitated in the past to reverse disciplinary sanctions that were even less severe than a public reprimand.[14] Moreover, a public reprimand in Ohio exacts a potentially severe deprivation of liberty and property interests that are fully protected by the Due Process Clause. The reprimand brands Zauderer as an unethical attorney who has violated his solemn oath of office and committed a "willful breach" of the Code of Professional Responsibility, and it has been published in statewide professional journals and the official reports of the Ohio Supreme Court.[15] This Court's casual indifference to the gravity of this injury inflicted on an attorney's good name demeans the entire legal profession.[16] In addition, under Ohio law "[a] person who has been . . . publicly reprimanded for misconduct, upon being found guilty of subsequent misconduct, shall be suspended for an indefinite period from the practice of law or permanently disbarred . . . ." Govt. Bar Rule V(7). In light of Ohio's vague rules, the governing authorities' refusal to provide clarification and

---

[14] See *In re R. M. J.,* 455 U. S., at 198 (private reprimand). See also *In re Primus,* 436 U. S. 412, 421 (1978) (public reprimand); *Bates* v. *State Bar of Arizona,* 433 U. S., at 358 (censure).

[15] See, *e. g.,* Govt. Bar Rules IV, V(5)(a), V(20)(a); App. to Juris. Statement 22a–23a. Zauderer also was taxed costs of $1,043.63. *Ibid.*

[16] "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," due process guarantees must scrupulously be observed. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 437 (1971). See also *Board of Regents* v. *Roth,* 408 U. S. 564, 573 (1972) (same with respect to "any charge . . . that might seriously damage [a person's] standing and associations in his community"); *Paul* v. *Davis,* 424 U. S. 693, 722–723 (1976) (BRENNAN, J., dissenting) ("[T]he enjoyment of one's good name and reputation has been recognized repeatedly in our cases as being among the most cherished of rights enjoyed by a free people, and therefore as falling within the concept of personal 'liberty'").

guidance to Zauderer, and the Ohio Supreme Court's "failure to specify precisely what disclosures [are] required," *ante,* at 653, n. 15, Zauderer will hereafter publish advertisements mentioning contingent fees only at his peril. No matter what disclaimers he includes, Ohio may decide after the fact that further information should have been included and might, under the force of its rules, attempt to suspend him indefinitely from his livelihood. Such a potential trap for an unwary attorney acting in good faith not only works a significant due process deprivation, but also imposes an intolerable chill upon the exercise of First Amendment rights. See *supra,* at 665–666, and n. 8.[17]

## II

The Office of Disciplinary Counsel charged that Zauderer's drunken driving advertisement was deceptive because it proposed a contingent fee in a criminal case—an unlawful arrangement under Ohio law. Amended Complaint ¶¶ 3–7, App. 22–23. Zauderer defended on the ground that the offer of a refund did not constitute a proposed contingent fee. This was the sole issue concerning the drunken driving advertisement that the Office complained of, and the evidence and arguments presented to the Board of Commissioners were limited to this question. The Board, however, did not

---

[17] The First Amendment protects not only the right of attorneys to disseminate truthful information about the availability of contingent-fee arrangements, but the right of the public to receive such knowledge as well. See, *e. g., Linmark Associates, Inc.* v. *Willingboro,* 431 U. S., at 96–97; *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S., at 770. Many members of the public fail to consult an attorney precisely out of ignorance concerning available fee arrangements. See, *e. g., Ohralik* v. *Ohio State Bar Assn.,* 436 U. S., at 473–475 (MARSHALL, J., concurring in part and concurring in judgment); *Bates* v. *State Bar of Arizona,* 433 U. S., at 370, and n. 22. Contingent-fee advertising, by providing information that is relevant to the potential vindication of legal rights, therefore serves interests far broader than the simple facilitation of commercial barter.

even mention the contingent-fee issue in its certified report. Instead, it found the advertisement "misleading and deceptive" on the basis of a completely new theory—that as a matter of "general knowledge" as discerned from certain "Municipal Court reports," drunken driving charges are "in many cases . . . reduced and a plea of guilty or no contest to a lesser included offense is entered and received by the court," so that in such circumstances "the legal fee would not be refundable." App. to Juris. Statement 11a. Although Zauderer argued before the Supreme Court of Ohio that this theory had never been advanced by the Office of Disciplinary Counsel, that he had never had any opportunity to object to the propriety of judicial notice or to present opposing evidence, and that there was no evidence connecting him to the alleged practice, the court adopted the Board's findings without even acknowledging his objections. 10 Ohio St. 3d, at 48, 461 N. E. 2d, at 886.

Zauderer of course might not ultimately be able to disprove the Board's theory. The question before the Court, however, is not one of prediction but one of process. "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence." *In re Oliver*, 333 U. S. 257, 273 (1948). Under the Due Process Clause, "reasonable notice" must include disclosure of "the *specific* issues [the party] must meet," *In re Gault*, 387 U. S. 1, 33–34 (1967) (emphasis added), and appraisal of "the factual material on which the agency relies for decision so that he may rebut it," *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 288, n. 4 (1974). These guarantees apply fully to attorney disciplinary proceedings because, obviously, "lawyers also enjoy first-class citizenship." *Spevack* v. *Klein*, 385 U. S. 511, 516 (1967). Where there is an "absence of fair notice as to the reach of the grievance procedure and the *precise* nature of the charges," so that the attorney is not given a meaningful opportunity to present evidence in his defense, the proceed-

ings violate due process. *In re Ruffalo,* 390 U. S., at 552 (emphasis added).[18]

The Court acknowledges these guarantees, but argues that the Board's change of theories after the close of evidence was "of little moment" because Zauderer had an opportunity to object to the Board's certified report before the Supreme Court of Ohio. *Ante,* at 654. This reasoning is untenable. Although the Supreme Court of Ohio made the ultimate determination concerning discipline, it held no *de novo* hearing and afforded Zauderer no opportunity to present evidence opposing the Board's surprise exercise of judicial notice. Under Ohio procedure, the court's role was instead limited to a record review of the Board's certified findings to determine whether they were "against the weight of the evidence" or made in violation of legal and procedural guarantees. *Cincinnati Bar Assn.* v. *Fennell,* 63 Ohio St. 2d 113, 119, 406 N. E. 2d 1129, 1133 (1980).[19] All that Zauderer could do was to argue that the Board's report was grounded on a theory that he had never been notified of and that he never had an opportunity to challenge with evidence of his own, and to request that proper procedures be followed.[20]

---

[18] The Court attempts to distinguish *Ruffalo* by explaining that the absence of fair notice in that case caused the attorney to give exculpatory testimony that, after it prompted the inclusion of additional charges, became inculpatory. *Ante,* at 655, n. 18. In the instant case, the Court assures, the absence of fair notice was not "particularly offensive" because it simply led Zauderer to *refrain* from presenting evidence that might have been exculpatory rather than to *present* evidence having an inculpatory effect. *Ibid.* This constricted interpretation of due process guarantees flies in the face of what I had thought was an "immutable" principle of our constitutional jurisprudence—that "the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene* v. *McElroy,* 360 U. S. 474, 496 (1959).

[19] See generally Govt. Bar Rule V(11)–(20). The attorney may only file a list of objections to the certified findings and recommendations along with a supporting brief. Rule V(18).

[20] See Brief for Respondent Zauderer In Support Of His Objections, No. DD 83–19 (S. Ct. Ohio), pp. 76–78.

The court completely ignored these objections.[21]   To hold that this sort of procedure constituted a meaningful "chance to be heard in a trial of the issues," *Cole* v. *Arkansas*, 333 U. S. 196, 201 (1948), is to make a mockery of the due process of law that is guaranteed every citizen accused of wrongdoing.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part, concurring in the judgment in part, and dissenting in part.

I join Parts I, II, V, and VI of the Court's opinion, and its judgment except insofar as it reverses the reprimand based on appellant Zauderer's use of unsolicited legal advice in violation of DR 2–103(A) and 2–104(A).   I agree that appellant was properly reprimanded for his drunken driving advertisement and for his omission of contingent fee information from his Dalkon Shield advertisement.   I also concur in the Court's judgment in Part IV.   At least in the context of print media, the task of monitoring illustrations in attorney advertisements is not so unmanageable as to justify Ohio's blanket ban.[1]   I dissent from Part III of the Court's opinion. In my view, the use of unsolicited legal advice to entice clients poses enough of a risk of overreaching and undue influence to warrant Ohio's rule.

Merchants in this country commonly offer free samples of their wares.   Customers who are pleased by the sample are likely to return to purchase more.   This effective marketing technique may be of little concern when applied to many products, but it is troubling when the product being dis-

---

[21] The mere opportunity unsuccessfully to bring procedural violations to the attention of an appellate-type forum obviously does not constitute the meaningful "chance to be heard" that is guaranteed by the Due Process Clause.   *Cole* v. *Arkansas*, 333 U. S. 196, 201–202 (1948).

[1] Like the majority, I express no view as to whether this is also the case for broadcast media.   As the Court observed in *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 384 (1977), "the special problems of advertising on the electronic broadcast media will warrant special consideration."

pensed is professional advice. Almost every State restricts an attorney's ability to accept employment resulting from unsolicited legal advice. At least two persuasive reasons can be advanced for the restrictions. First, there is an enhanced possibility for confusion and deception in marketing professional services. Unlike standardized products, professional services are by their nature complex and diverse. See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 773, n. 25 (1976). Faced with this complexity, a layperson may often lack the knowledge or experience to gauge the quality of the sample before signing up for a larger purchase. Second, and more significantly, the attorney's personal interest in obtaining business may color the advice offered in soliciting a client. As a result, a potential customer's decision to employ the attorney may be based on advice that is neither complete nor disinterested.

These risks are of particular concern when an attorney offers unsolicited advice to a potential client in a personal encounter. In that context, the legal advice accompanying an attorney's pitch for business is not merely apt to be complex and colored by the attorney's personal interest. The advice is also offered outside of public view, and in a setting in which the prospective client's judgment may be more easily intimidated or overpowered. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447 (1978). For these reasons, most States expressly bar lawyers from accepting employment resulting from *in person* unsolicited advice.[2] Some States, like the American Bar Association in its Model Rules of Professional Conduct, extend the prohibition to employment re-

---

[2] See, *e. g.*, Alaska DR 2–104(A); Ariz. DR 2–104(A); Ark. DR 2–104(A); Colo. DR 2–104(A); Conn. DR 2–104(A); Del. DR 2–104(A); D. C. DR 2–104(A); Ga. DR 2–104(A); Ind. DR 2–104(A); Kan. DR 2–104(A); Mo. DR 2–104(A); Mont. DR 2–104(A); Nev. DR 2–104(A); N. M. DR 2–104(A); N. C. DR 2–104(A); N. D. DR 2–104(A); Okla. DR 2–104(A); Tenn. DR 2–104(A); Utah DR 2–104(A); Wash. DR 2–104(A); W. Va. DR 2–104(A); Wyo. DR 2–104(A).

sulting from unsolicited advice in telephone calls, letters, or communications directed to a specific recipient.[3] Ohio and 14 other States go a step further. They do not limit their rules to certain methods of communication, but instead provide that, with limited exceptions, a "lawyer who has given unsolicited legal advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice."[4]

The issue posed and decided in Part III of the Court's opinion is whether such a rule can be applied to punish the use of legal advice in a printed advertisement soliciting business. The majority's conclusion is a narrow one: "An attorney may not be disciplined for soliciting legal business through printed advertising containing truthful and nondeceptive . . . advice regarding the legal rights of potential clients." *Ante*, at 647. The Court relies on its commercial speech analysis in *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557 (1980), and *In re R. M. J.*, 455 U. S. 191 (1982). As the Court notes, *Central Hudson Gas & Electric* establishes that a State can prohibit truthful and nondeceptive commercial speech only if the restriction directly advances a substantial government interest. *In re R. M. J.* went further, stating that a State cannot place an absolute prohibition on certain types of potentially misleading information if the information may also be presented in a way that is not deceptive. 455 U. S., at 203.

Given these holdings, the Court rejects Ohio's ban on the legal advice contained in Zauderer's Dalkon Shield advertise-

---

[3] See ABA Model Rule of Professional Conduct 7.3 (1983); Haw. DR 2–103, DR 2–104; Me. Rule 3.9(F); Minn. DR 2–103(A) (in person and telephonic solicitation); S. D. DR 2–103, DR 2–104(A).

[4] See Idaho DR 2–104; Ky. DR 2–104(A); Md. DR 2–104(A); Mich. DR 2–104(A); Miss. DR 2–104(A); Neb. DR 2–104(A); N. J. DR 2–104(A); N. Y. DR 2–104(A); Ohio DR 2–104(A); Ore. DR 2–104(A); Pa. DR 2–104(A); R. I. DR 2–104(A); Tex. DR 2–104(A); Vt. DR 2–104(A); Wis. DR 2–104(A).

ment: "do not assume it is too late to take legal action against the . . . manufacturer." App. 15. Surveying Ohio law, the majority concludes that this advice "seems completely unobjectionable," *ante*, at 640. Since the statement is not misleading, the Court turns to the asserted state interests in restricting it, and finds them all wanting. The Court perceives much less risk of overreaching or undue influence here than in *Ohralik* simply because the solicitation does not occur in person. The State's interest in discouraging lawyers from stirring up litigation is denigrated because lawsuits are not evil, and States cannot properly interfere with access to our system of justice. Finally, the Court finds that there exist less restrictive means to prevent attorneys from using misleading legal advice to attract clients: just as the Federal Trade Commission has been able to identify unfair or deceptive practices in the marketing of mouthwash and eggs, *Warner-Lambert Co.* v. *FTC*, 183 U. S. App. D. C. 230, 562 F. 2d 749 (1977), *National Comm'n on Egg Nutrition* v. *FTC*, 570 F. 2d 157 (CA7 1977), the States can identify unfair or deceptive legal advice without banning that advice entirely. *Ante*, at 645–646. The majority concludes that "[t]he qualitative distinction the State has attempted to draw eludes us." *Ante*, at 646.

In my view, state regulation of professional advice in advertisements is qualitatively different from regulation of claims concerning commercial goods and merchandise, and is entitled to greater deference than the majority's analysis would permit. In its prior decisions, the Court was better able to perceive both the importance of state regulation of professional conduct, and the distinction between professional services and standardized consumer products. See, *e. g.*, *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792 (1975). The States understandably require more of attorneys than of others engaged in commerce. Lawyers are *professionals*, and as such they have greater obligations. As Justice Frankfurter once observed, "[f]rom a profession charged with [constitutional] responsibilities there must be

exacted . . . qualities of truth-speaking, of a high sense of honor, of granite discretion." *Schware* v. *Board of Bar Examiners of New Mexico,* 353 U. S. 232, 247 (1957). The legal profession has in the past been distinguished and well served by a code of ethics which imposes certain standards beyond those prevailing in the marketplace and by a duty to place professional responsibility above pecuniary gain. While some assert that we have left the era of professionalism in the practice of law, see *Florida Bar* v. *Schreiber,* 420 So. 2d 599 (Fla. 1982) (opinion of Ehrlich, J.), substantial state interests underlie many of the provisions of the state codes of ethics, and justify more stringent standards than apply to the public at large.

The Court's commercial speech decisions have repeatedly acknowledged that the differences between professional services and other advertised products may justify distinctive state regulation. See *Virginia Pharmacy Board,* 425 U. S., at 773, n. 25; *id.,* at 773–775 (opinion of BURGER, C. J.); *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 383–384 (1977); *In re R. M. J., supra,* at 204, n. 15. Most significantly, in *Ohralik,* the Court found that the strong state interest in maintaining standards among members of licensed professions and in preventing fraud, overreaching, or undue influence by attorneys justified a prophylactic rule barring in person solicitation. 436 U. S., at 460–462. Although the antisolicitation rule in *Ohralik* would in some circumstances preclude an attorney from honestly and fairly informing a potential client of his or her legal rights, the Court nevertheless deferred to the State's determination that risks of undue influence or overreaching justified a blanket ban. See also *Friedman* v. *Rogers,* 440 U. S. 1 (1979) (upholding Texas prohibition on use of any trade name in the practice of optometry due to risk of deceptive or misleading use of trade names). At a minimum, these cases demonstrate that States are entitled under some circumstances to encompass truthful, nondeceptive speech within a ban of a type of advertising that threatens substantial state interests.

In my view, a State could reasonably determine that the use of unsolicited legal advice "as bait with which to obtain agreement to represent [a client] for a fee," *Ohralik*, 436 U. S., at 458, poses a sufficient threat to substantial state interests to justify a blanket prohibition. As the Court recognized in *Ohralik*, the State has a significant interest in preventing attorneys from using their professional expertise to overpower the will and judgment of laypeople who have not sought their advice. While it is true that a printed advertisement presents a lesser risk of overreaching than a personal encounter, the former is only one step removed from the latter. When legal advice is employed within an advertisement, the layperson may well conclude there is no means to judge its validity or applicability short of consulting the lawyer who placed the advertisement. This is particularly true where, as in appellant's Dalkon Shield advertisement, the legal advice is phrased in uncertain terms. A potential client who read the advertisement would probably be unable to determine whether "it is too late to take legal action against the . . . manufacturer" without directly consulting the appellant. And at the time of that consultation, the same risks of undue influence, fraud, and overreaching that were noted in *Ohralik* are present.

The State also has a substantial interest in requiring that lawyers consistently exercise independent professional judgment on behalf of their clients. Given the exigencies of the marketplace, a rule permitting the use of legal advice in advertisements will encourage lawyers to present that advice most likely to bring potential clients into the office, rather than that advice which it is most in the interest of potential clients to hear. In a recent case in New York, for example, an attorney wrote unsolicited letters to victims of a massive disaster advising them that, in his professional opinion, the liability of the potential defendants is clear. *Matter of Von Wiegen*, 101 App. Div. 2d 627, 474 N. Y. S. 2d 147, modified, 63 N. Y. 2d 163, 470 N. E. 2d 838 (1984), cert. pending,

No. 84–1120. Of course, under the Court's opinion claims like this might be reached by branding the advice misleading or by promulgating a state rule requiring extensive disclosure of all relevant liability rules whenever such a claim is advanced. But even if such a claim were completely accurate—even if liability were in fact clear and the attorney actually thought it to be so—I believe the State could reasonably decide that a professional should not accept employment resulting from such unsolicited advice. See *Ohralik, supra,* at 461 (noting that DR 2–104(A) serves "to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest"). Ohio and other States afford attorneys ample opportunities to inform members of the public of their legal rights. See, *e. g.,* Ohio DR 2–104(A)(4) (permitting attorneys to speak and write publicly on legal topics as long as they do not emphasize their own experience or reputation). Given the availability of alternative means to inform the public of legal rights, Ohio's rule against legal advice in advertisements is an appropriate means to assure the exercise of independent professional judgment by attorneys. A State might rightfully take pride that its citizens have access to its civil courts, *ante,* at 643, while at the same time opposing the use of self-interested legal advice to solicit clients.

In the face of these substantial and legitimate state concerns, I cannot agree with the majority that Ohio DR 2–104(A) is unnecessary to the achievement of those interests. The Ohio rule may sweep in some advertisements containing helpful legal advice within its general prohibition. Nevertheless, I am not prepared to second-guess Ohio's longstanding and careful balancing of legitimate state interests merely because appellant here can invent a less restrictive rule. As the Iowa Supreme Court recently observed, "[t]he professional disciplinary system would be in chaos if violations could be defended on the ground the lawyer involved could think of a better rule." *Committee On Professional*

*Ethics and Conduct of Ohio State Bar Assn.* v. *Humphrey,*
355 N. W. 2d 565, 569 (1984), cert. pending, No. 84–1150.
Because I would defer to the judgment of the States that
have chosen to preclude use of unsolicited legal advice to en-
tice clients, I respectfully dissent from Part III of the Court's
opinion.