# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

─────────

No. 13-20250

─────────

United States Court of Appeals
Fifth Circuit

**FILED**

August 21, 2015

Lyle W. Cayce
Clerk

TEST MASTERS EDUCATIONAL SERVICES, INC.,

      Plaintiff - Appellant

v.

ROBIN SINGH EDUCATIONAL SERVICES, INC.; ROBIN SINGH,

      Defendants - Appellees

───────────────────────────────────────────────

Cons w/ 13-20327

ROBIN SINGH EDUCATIONAL SERVICES, INCORPORATED; ROBIN SINGH, doing business as Testmasters;

      Plaintiffs - Appellants

v.

TESTMASTERS EDUCATIONAL SERVICES, INCORPORATED,

      Defendant - Appellee

v.

DANIEL J SHEEHAN, JR.,

      Appellant

─────────────────────────

 Cons/W 14-20113

TEST MASTERS EDUCATIONAL SERVICES, INCORPORATED,

Plaintiff - Appellee

v.

ROBIN SINGH EDUCATIONAL SERVICES, INCORPORATED; ROBIN SINGH,

Defendants - Appellants

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

Before HIGGINBOTHAM, DAVIS, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This consolidated appeal involves a dispute between two test preparation companies with competing claims to the TESTMASTERS trademark. The parties have been litigating the issue for over a decade. This is the fourth time one of the parties has appealed to this court. We are again asked to consider various issues related to their trademark dispute, mainly whether each party is entitled to federal registration of the mark. The district court granted both parties' motions for summary judgment, denying nationwide registration to both. In addition, we have before us an appeal from a different district court's order finding one of the parties and his attorney to be in contempt, and ordering the attorney to be briefly jailed. We VACATE the finding of contempt entered against Daniel Sheehan. We otherwise AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

Both parties are in the test preparation business. They each offer courses designed to help individuals pass or achieve higher scores on various

standardized tests. The problem, and the catalyst of this ongoing litigation, is that both parties offer these courses using the "TESTMASTERS" name.[1]

Test Masters Educational Services, Inc. ("TES") operates under the name "Testmasters." TES was founded by Haku Israni in 1991 and started offering test preparation courses for multiple entrance and licensing exams in 1992. TES initially concentrated on engineering licensing exams, but has since expanded to offer courses for a variety of other exams, including the LSAT. Until 2002, TES offered live courses only in Texas, primarily in Houston; it has since expanded to offer courses outside of the state. Vivek ("Roger") Israni, Haku Israni's son, is the current owner and president of TES.

Robin Singh Educational Services, Inc. and its owner, Robin Singh (collectively "Singh"), started offering test preparation courses under the name "TestMasters" in 1991. Singh initially offered only LSAT courses in California, but has since expanded to offer courses nationwide for a variety of exams.

Singh applied for federal registration of TESTMASTERS in June 1995. The United States Patent and Trademark Office ("PTO") initially denied his application, finding that there were three substantially similar marks already registered. In March 1999, after determining that none of the three marks were still in use, the PTO approved Singh's application.

Apparently, neither party knew of the other until that time. After the PTO granted Singh registration of the mark, he attempted to create a website. He discovered that TES already owned the domain name "testmasters.com." Singh's attorney sent TES a demand letter, claiming that TES's use of the domain name infringed Singh's trademark rights.

---

[1] The parties have, at various times described the trademark they seek as "Testmasters," "TestMasters," "Test Masters," and "TESTMASTERS." For consistency with this court's prior opinions, we will refer to the mark as "TESTMASTERS" or "the mark."

It was at this point that the first of the numerous lawsuits seeking recognition of a trademark was filed. We will give a brief summary of the state of the issues at the end of each respective decision by this court.

The first suit was brought by TES against Singh in August 1999. In our decision we held that TESTMASTERS is descriptive, that TES's rights to the mark were limited to Texas, and that Singh had failed to prove that the mark had acquired secondary meaning. *See Test Masters Educ. Servs. v. Singh*, 46 F. App'x 227 (5th Cir. 2002) ("*Testmasters I*").

Two days after our *Testmasters I* decision, Singh filed a new lawsuit. At its conclusion, we again held that the mark was descriptive, TES had no rights to the mark outside of Texas, Singh was enjoined from interfering with TES's use of the mark in Texas, and Singh could challenge TES's claim to the mark outside of Texas. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2005) ("*Testmasters II*").

Singh filed the third suit in November 2003, before the second suit was resolved. We held that there had not been a significant intervening factual change to allow re-litigation of the secondary meaning issue. *See Robin Singh Educ. Servs. Inc. v. Excel Test Prep Inc.*, 274 F. App'x 399, 406 (5th Cir. 2008) ("*Testmasters III*").

Today's appeal earns the label *Testmasters IV*. The origins of part of the case are a series of three applications TES filed in 2001 with the PTO for nationwide registration of the TESTMASTERS mark. Singh filed oppositions to all three applications. The Trademark Trial and Appeal Board ("TTAB") consolidated the three matters. In August 2007, the TTAB granted Singh leave to amend his notices of opposition to assert that TES's mark lacked distinctiveness. In particular, Singh was allowed to amend his opposition to assert that TES was bound by the jury's finding in 2001 that the mark is descriptive. In that same decision, the TTAB held that collateral estoppel did

not bar Singh from attempting to prove his claims regarding secondary meaning.

Meanwhile, TES, in June 2008, filed a new suit against Singh in the United States District Court for the Southern District of Texas, alleging trademark infringement and other claims.  TES sought an order from the district court directing the PTO to grant its pending applications for registration.  Singh filed counterclaims, asserting trademark infringement and seeking an order directing the PTO to reinstate his prior registration of the mark for the District of Columbia and all states except Texas.  This time, the case was assigned to Judge Atlas instead of Judge Gilmore, who had handled the three prior cases.

In October 2008, on Singh's motion, the district court stayed the case to allow the TTAB to complete its proceedings.  The stay would be lifted in June 2011.  In March 2011, the TTAB denied TES's applications for nationwide registration, holding that the mark was descriptive and that TES had failed to demonstrate "substantially exclusive use" of the descriptive mark.  Following that ruling, TES filed an appeal of the TTAB decision in district court; that appeal was consolidated with the proceedings before Judge Atlas.  In October 2012, the PTO issued TES registration of the mark for the state of Texas.

In April 2013, the district court affirmed the TTAB's decision denying TES geographically unrestricted use of the mark, granting Singh's motion requesting a declaration that the mark is descriptive rather than distinctive, granting Singh summary judgment on TES's infringement claims, and dismissing Singh's infringement counterclaims based on collateral estoppel.

One month before Judge Atlas ruled on the parties' motions for summary judgment, TES filed a motion to hold Singh in contempt of the long-standing injunction in the case pending before Judge Gilmore.  Those proceedings went ahead separately.  We discuss them in more detail later.  Because of the

complexity of the parallel proceedings, TES filed a motion to alter or amend the judgment in order to ensure that the two proceedings would remain separate. The district court denied the motion and TES then filed its initial notice of appeal to this court.

Singh filed for reconsideration. In February 2014, the district court denied the motion but clarified "that all issues related to Singh's alleged violation of the Permanent Injunction issued by Judge Gilmore were not reached by this Court's April 13 Memorandum and Order." That ruling was in response to TES's request that the court confirm it had not addressed Singh's possible violations of the permanent injunction before Judge Gilmore.

Separately, Singh moved to dismiss his state-law infringement claims against TES, which the district court granted without prejudice. The district court entered its final judgment on February 21, 2014. Both parties appealed.

## DISCUSSION

"This court reviews a district court's grant of summary judgment *de novo*, applying the same standards as the district court." *Barker v. Hercules Offshore, Inc.*, 713 F.3d 208, 212 (5th Cir. 2013) (citation and quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The applicability of collateral estoppel is a question of law," also reviewed *de novo*. *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013).

*I. TES's Trademark Appeal*

*A. Standing*

TES argues Singh has no standing to oppose its trademark registration. It states that "whether the matter is viewed as a literal Article III injury and

redressability problem, a prudential 'zone of interest' analysis, or as the direct effects of estoppel and bar, Singh's opposition to TES's application *based on his own asserted rights and use of the same mark* should not have been entertained." Thus, Singh's opposition to TES's registration should have been dismissed because he had previously lost on the secondary meaning issue.

The district court rejected this argument: "The court notes specifically that Singh is not permanently enjoined from claiming the trademark, only from 'pursuing registration' of the trademark. There is no injunction in place that precludes Singh from claiming common law trademark protection . . . ."

We agree. This court in *Testmasters II* vacated the injunction "insofar as it enjoins Singh from opposing or interfering with TES's contention that it has rights to the TESTMASTERS mark outside of Texas . . . ." *Testmasters II*, 428 F.3d at 580. Singh has standing.

*B. Secondary Meaning Claim*

TES's primary contention on appeal is that the district court erred in concluding that it had failed to demonstrate that its use of the mark has acquired secondary meaning in "unrestricted geographic and subject matter areas."

"In order to be registered as a trademark, a mark must be capable of distinguishing the applicant's goods from those of others, or stated another way, a mark must be distinctive." *Id.* at 566 (citation and internal quotation marks omitted). "A mark is *inherently* distinctive if by its intrinsic nature the mark serves to identify the particular source of the product." *Id.* "Descriptive marks are marks that denote a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id.* (citation and internal quotation marks omitted). Descriptive marks cannot be protected unless they acquire distinctiveness through secondary meaning. *Id.*

"Secondary meaning occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008) (citation and internal quotation marks omitted). "A mark has acquired secondary meaning when it has come through use to be uniquely associated with a specific source." *Id.* (citation and quotation marks omitted). This court uses the following seven-factor test to determine whether a mark has acquired secondary meaning:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the [mark].

*Id.* (citation and quotation marks omitted). "These factors in combination may show that consumers consider a mark to be an indicator of source even if each factor alone would not prove secondary meaning." *Id.*

TES does not appeal the district court's determination that "TES is judicially estopped from asserting that the [m]ark is other than descriptive." Therefore, the only issue is whether the district court erred in concluding that TES had failed to establish secondary meaning.

TES begins by arguing that the district court "should not have afforded any weight to the TTAB's holding" because the TTAB applied a "substantially exclusive use" standard to evaluate secondary meaning instead of this court's seven-factor test. A review of the district court's ruling reveals it did not rely on the TTAB decision, but instead conducted its own review. This preliminary argument is thus meritless.

TES next argues that the issue of secondary meaning should not have been resolved on summary judgment because it presented overwhelming evidence on each of the seven secondary meaning factors. First, with regard to

length and manner of use of the mark, TES noted that it has consistently used the TESTMASTERS mark since it started doing business in 1991 in connection with a wide range of test preparation courses. The district court explained that the undisputed evidence showed that: (1) TES and Singh have both been in the test preparation business "for many years," (2) Singh first started using the mark in California while TES first started using the mark in Texas, and (3) Singh is the prior user of the mark for LSAT courses and TES is the prior user of the mark for engineering exams.

As to the second factor, TES presented the district court with evidence relating to its volume of sales, including evidence showing that it has: (1) held thousands of live courses in 22 states, (2) earned tens of millions of dollars in revenue between 2002 and 2011, and (3) enrolled students with home addresses in all 50 states. The district court concluded that the evidence showed that Singh's company is larger and has significantly more business outside of Texas. TES's revenue outside of Texas is primarily from engineering courses. The court determined that TES's evidence showing customer enrollment in all 50 states was unreliable because its figures were based on the student's home address as opposed to where the courses were actually offered. The court found this to be an unpersuasive attempt by TES to claim use of the mark in states in which it actually offers no courses. We find no error.

Next, TES contends that it put forth evidence showing that it has spent over $100,000 on advertising each year since 1999. The district court properly pointed out that the evidence showed that both parties advertised extensively; TES's advertising is directed primarily at engineering students while Singh's is directed primarily at students preparing for the LSAT.

With regard to the fourth factor, use of the mark in newspapers and magazines, TES offered the following evidence: (1) TES has been the subject of

interviews on National Public Radio and the BusinessMakers Radio Show, (2) TES's president received media coverage after being named "Entrepreneur of the Year" in 2012 by the Houston Asian Chamber of Commerce, (3) articles on TES have appeared in *The Asian Business Journal*, (4) TES has advertised in several newspapers, and (5) TES has a significant internet presence. The district court acknowledged that TES has made a "sizeable investment in website design" and uses the mark on its website. The court did not comment on TES's other evidence.

On the fifth factor, TES submitted evidence of a survey conducted by Dr. Isabella Cunningham, Chair of the Department of Advertising and Public Relations at the University of Texas. The survey polled 300 people who had recently taken or were planning on taking engineering exams. Half of the respondents were from Texas and the other half were from Arizona, Florida, and South Carolina. Of those interviewed, 50.7 percent stated that they associated "Testmasters" with one company. The district court found TES's survey evidence "unpersuasive" for two reasons. First, though the respondents stated that they identified "Testmasters" with one company, they did not identify which company. The district court concluded that the "one company" could have been Singh "or any company other than TES . . . ." Second, the court noted that the survey was flawed because it was directed only at people taking engineering exams and half of those polled were from Texas. The court explained that TES has exclusive use of the TESTMASTERS mark in Texas and it is, therefore, "not surprising that where half the survey respondents are in Texas, half the survey respondents would recognize the name 'Testmasters' and associate it with 'one company'. . . ." These observations are valid characterizations of the survey.

TES's evidence on the sixth factor, direct consumer testimony, included: (1) thousands of letters and e-mails from satisfied customers, (2) statements

No. 13-20250 c/w 13-20327; 14-20113

from individuals explaining that they identify TESTMASTERS solely with TES, (3) thousands of evaluation forms submitted by customers, and (4) evidence of referral fees paid to former students.  The district court acknowledged TES's evidence of consumer views, but, as with the survey evidence, found it unpersuasive because it was primarily from engineering students.  Singh also presented consumer-testimony evidence showing "confusion by persons registering for TES's LSAT preparation course believing they were registering for Singh's course."  The court correctly concluded that "[e]ach party's evidence shows that, in its strongest subject matter area, it is well-known and there may be some consumer confusion."

On the seventh and final factor, the defendant's intent in copying the mark, TES contended that Singh has continued to use the mark in spite of repeated judicial determinations.  TES also asserted that it has sought to avoid consumer confusion by having all customers enrolled in its LSAT course sign a form disclosing Singh's existence, but Singh has made no similar effort.  The district court concluded that there is no evidence of copying, as the record establishes that Singh was using the mark in California before TES began using it in Texas.

TES contends that the district court's "fundamental error was its failure to evaluate the evidence of secondary meaning introduced by TES independently of Singh's competing and . . . entirely improper effort to show that the mark had instead developed secondary meaning as to *his* LSAT classes."  Thus, TES asserts that the district court should have analyzed the secondary meaning issue without considering any evidence introduced by Singh.  To the extent this argument arises from the contention that Singh does not have standing to oppose its registration claim, we have already rejected that argument.  TES provides no authority indicating that the district court was required to consider its evidence of secondary meaning in a vacuum.  The

11

court's role at the summary judgment stage was to determine whether there was a genuine dispute of material fact regarding the existence of secondary meaning. "In assessing a claim of secondary meaning, the major inquiry is the consumer's attitude toward the mark." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004). "The mark must denote to the consumer a single thing coming from a single source . . . ." *Id.* (citations and quotation marks omitted). Given this fundamental inquiry, which required the court to determine whether TES had raised a dispute of fact as to whether consumers associate the mark with only its company, we find no error in the district court's consideration of evidence presented by both parties in conducting its analysis.

As to TES's assertion that its evidence was more than sufficient to survive summary judgment, we disagree. What TES needed to show was that the mark had "secondary meaning on a nationwide basis for all test preparation courses." Instead, the evidence indicated, at most, that the mark has acquired a secondary meaning for professional engineering examinations. It did not show that the mark had a secondary meaning for any other, much less all, test preparation services. We agree that TES's evidence did not show that consumers associate the mark solely with TES with respect to all test preparation services.

The district court conducted a thorough analysis of each of the seven factors and did not, as TES contends, assign inadequate weight to its evidence. TES has not raised a factual dispute regarding the existence of secondary meaning.

## C. Singh's State-Law Counterclaims

TES urges that the district court erred in granting Singh's motion to dismiss his state-law counterclaims without prejudice under Federal Rule of Civil Procedure 41(a)(2).

Motions for voluntary dismissal generally "should be freely granted unless the non-moving party will suffer some plain legal prejudice other than the mere prospect of a second lawsuit." *Elbaor v. Tripath Imaging, Inc.*, 279 F.3d 314, 317 (5th Cir. 2002). "Therefore, faced with a Rule 41(a)(2) motion the district court should first ask whether an unconditional dismissal will cause the non-movant to suffer plain legal prejudice. If not, it should generally, absent some evidence of abuse by the movant, grant the motion." *Id.* In granting the motion, the district court explained that TES had not alleged any potential prejudice other than the prospect of additional litigation.

We find no error in the district court's grant of Singh's Rule 41 motion for voluntary dismissal.

## II. Singh's Trademark Cross-appeal

## A. Collateral Estoppel

Singh contends that the district court erred in applying the doctrine of collateral estoppel. In *Testmasters I*, this court held that Singh failed to establish that his mark had acquired secondary meaning. *See* 46 F. App'x at *5. In *Testmasters II*, Singh again tried to litigate the secondary meaning issue. *See* 428 F.3d at 570–76. This court held that the second suit was barred by collateral estoppel. *See id.* at 576. Singh tried once more in *Testmasters III*; this court again held that Singh's claim was barred. *See* 274 F. App'x at 404. Now, Singh argues that he is no longer barred by collateral estoppel because there has been a "significant intervening factual change."

13

"Collateral estoppel precludes a party from litigating an issue already raised in an earlier action between the parties only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action." *Testmasters II*, 428 F.3d at 572. In *Testmasters II*, we recognized an exception for instances in which there has been a "significant intervening factual change." *See id.* at 572–76. We identified two cases in which we had allowed the issue of secondary meaning to be re-litigated. *See id.* at 573 (citing *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684 (5th Cir. 1992); *Cont'l Motors Corp. v. Cont'l Aviation Corp.*, 375 F.2d 857 (5th Cir. 1967)).

*Texas Pig Stands* involved litigation between two restaurants, Texas Pig Sandwich and Hard Rock Café, over rights to the term "pig sandwich." 951 F.2d at 687. Texas Pig, who had registered the term, sued Hard Rock for infringement. *Id.* at 688. After a jury found Hard Rock guilty of deliberate infringement, it appealed to this court, claiming that Texas Pig was collaterally estopped from claiming that "pig sandwich" was a valid trademark. *Id.* at 689. Hard Rock relied on a 1930 Texas state court decision involving Texas Pig's predecessor, Pig Stands, Inc., in which the court held that "pig sandwich" had not acquired secondary meaning. *Id.* at 690. We rejected Hard Rock's argument and allowed re-litigation of the issue. *Id.* We explained that although the term did not have secondary meaning in 1930, it could eventually acquire secondary meaning. *Id.* The *Texas Pig Stands* decision was based in part on this court's earlier decision in *Continental Motors*, "which held that in the interim between initiation of [an] action and a prior decision on the same question, the mark at issue had acquired secondary meaning because of [a] 'change in economic fact,' which had created in the public an image of the mark

14

as associated with its source." *Testmasters II*, 428 F.3d at 573 (citing *Continental Motors*, 375 F.2d at 862).

In *Testmasters II*, we explained that, unlike in *Texas Pig Stands* and *Continental Motors*, Singh had not alleged a "significant intervening factual change." *Id.* at 576. We declined to hold that a specific number of years must pass before secondary meaning may be re-litigated, but we also held that Singh had failed to allege a "set of facts that would suggest that there has been a change in the minds of the public in the relevant geographic area such that they could immediately associate the 'TESTMASTERS' mark with his test preparation corporation." *Id.*

Singh now argues that, after 13 more years, his "allegations and evidence show dramatic changes in every factor relevant to the secondary meaning analysis" and he has thus met his burden of demonstrating an intervening factual change to justify re-litigation of secondary meaning. In particular, Singh notes that his annual revenues have increased from just over $3 million in 2001 to an average of $14 million between 2008 and 2010. Singh also notes that he has greatly expanded his advertising and has received "extensive media exposure." Furthermore, in 2009, Singh's expert conducted a survey, which showed that 58.1 percent of all students taking an LSAT course were aware of Singh's TESTMASTERS mark. Singh also suggests that the growth of the internet since 2001 is "dramatic" and "significant" and customer confusion between TES and Singh has since "become epidemic." Finally, Singh argues that the district court erred in holding that there are no special circumstances that warrant reconsideration of the secondary meaning issue.

The district court concluded that Singh's "business-growth" argument was insufficient. The court also rejected Singh's argument regarding his increased internet presence. Finally, the court held that a sufficient amount of time had not yet passed.

No. 13-20250 c/w 13-20327; 14-20113

We find no error in the district court's application of collateral estoppel. A "significant intervening factual change" must be shown. Evidence of increased business success alone is insufficient to show a significant intervening change. *Id.* Instead, Singh must provide evidence showing "a change in the minds of the public . . . such that they could immediately associate the 'TESTMASTERS' mark with his [business]." *Id.* He has again provided no such evidence. He also has not shown any special circumstances warranting re-litigation.

*B. Related Goods and Services*

Singh next argues that the district court ignored the "doctrine of related goods and services." In applying collateral estoppel, the district court concluded that "Singh's infringement counterclaims are based on Singh's position that its use of the [m]ark has acquired secondary meaning nationwide (except Texas) for all preparation courses for all standardized tests in all subject matter areas." Singh argues that this characterization of the pleadings is incorrect. Instead, he argues that his pleadings, fairly interpreted, included claims that he had "protectable rights" in the mark nationwide and had established secondary meaning by virtue of his dominance in the LSAT preparation market. According to him, "[b]y requesting protection for test preparation goods and services generally, [he] did not become obligated to separately prove secondary meaning in each division of the industry."

It is true that if a party has a valid trademark, infringement occurs when someone else uses the same mark for related goods and services when such use could lead to confusion in either of two ways: "(1) likelihood of confusion as to the 'affiliation, connection or association' of one person or entity with another or (2) likelihood of confusion as to the 'origin, sponsorship or approval' of one entity's goods or services with those of another." 4 J. THOMAS MCCARTHY,

No. 13-20250 c/w 13-20327; 14-20113

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24.6 (2014) (citations omitted). The two users of the mark do not even need to be competitors as to the specific product so long as the possibility of confusion in one of these ways would arise. *Id.*; *see also Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 202 (5th Cir. 1998).

Regardless of whether the district court's characterization of this part of Singh's pleadings was correct, collateral estoppel still applies. Because Singh has not shown the necessary association by the public of the mark with his business, the doctrine of related goods and services does not offer Singh a way to escape the preclusive effects of the prior judgment.

*C. Limited Trademark*

Finally, Singh argues that the district court erred in failing to hold, *sua sponte*, that the mark has acquired secondary meaning with respect to LSAT courses. The district court noted that "[i]t is conceivable that Singh would not be collaterally estopped from asserting and presenting evidence on the different, more narrow, issue that its use has acquired secondary meaning for LSAT preparation courses. Singh has not indicated any interest, however, in pursuing a more narrow claim." According to Singh, even though he had not "indicated any interest . . . in pursuing" the more narrow claim, the court should have *sua sponte* ruled on the issue.

In his motion for reconsideration, Singh argued that the issue had been tried by implied consent, and regardless, he should be allowed to amend his pleadings to allege this claim. The district court denied the motion for reconsideration, providing detailed reasons. On appeal, Singh makes a conclusory argument without addressing any aspects of the district court's opinion. He has therefore waived review of this argument. *See United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

17

*III. Contempt Appeal*

This consolidated case also includes an appeal of several contempt orders entered by the district court, in the proceeding before Judge Gilmore, against Singh and his lawyer, Daniel Sheehan.

The contempt orders stem from the permanent injunctions entered by the district court in 2003 and 2004. In 2003, the court issued an order permanently enjoining Singh from: (1) pursuing federal registration of the TESTMASTERS mark in the PTO, (2) interfering with or opposing TES's application for federal registration of the TESTMASTERS mark, and (3) using the mark within or directing use of the mark at the state of Texas. In 2004, in response to TES's claims that Singh had engaged in repeated harassment, the district court issued a new injunction, which largely reiterated the first but also "enjoined Singh from communicating directly with, threatening, or harassing [TES], its employees, its staff, or TES's counsel, counsel's employees, or counsel's staff." The district court warned Singh that he should abide by the injunction "this time to avoid the future risk of sanctions by this Court against him and his counsel."

Singh challenged the injunction before this court in *Testmasters II*. We reversed the injunction insofar as it enjoined Singh from directly communicating with TES, but affirmed insofar as it barred Singh from threatening or harassing TES and its employees. *See* 428 F.3d at 580.

According to TES, Singh was undeterred by the injunction and continued his "campaign of terror." TES provides examples of alleged violations. Among these, Singh: continued to advertise in Texas, instructed employees to post negative comments about TES on various websites, and aided in the posting of defamatory videos online. One posting referenced a state-court paternity suit involving TES's founder, Haku Israni; the posting labeled Israni a "deadbeat dad" and mentioned the minor child involved in the suit by name.

In March 2013, TES filed a motion for order to show cause, arguing that Singh's actions constituted harassment in violation of the injunction. A contempt hearing was held on May 16 and 17. Singh was not required to attend the hearing. On May 16, Sheehan appeared on Singh's behalf. Sheehan argued that: (1) the postings were protected by the First Amendment, and regardless, (2) the injunction did not prohibit such postings. The court asked Sheehan whether he had ever discussed removing the postings with Singh. Sheehan responded that he could not answer that because of the attorney-client privilege. In response, the court informed Sheehan that he would be incarcerated in an effort to coerce Singh to remove the postings. Sheehan was handcuffed by the United States Marshals and escorted to a federal detention center in Houston. Later that day, Sheehan's associate began working with Singh to remove the postings. After being informed of these efforts, the court had Sheehan released from custody. The court ordered Sheehan to appear the next day. At the May 17 hearing, the court acknowledged Singh's progress toward remedying the contempt. The court then issued a series of orders instructing Singh to remove the harassing publications. The court ordered that Sheehan not be re-incarcerated but reserved the right to continue monitoring Singh's efforts.

On May 24, TES filed a motion requesting additional contempt sanctions against Singh. The district court granted the motion in part and ordered Singh to publish a "remedial posting" on "ripoffreport.com" in response to the "deadbeat dad" post he had previously made. The order required Singh to post, in part, that he "would now like to retract his prior complaint."

Along with its March 2013 contempt motion, TES filed a motion to file under seal. TES claimed the conduct giving rise to the contempt motion included willful violations of a Texas state court sealing order. The district court ordered the record of the contempt proceedings sealed, but gave no

written reasons.  On May 31, Singh filed a motion to unseal the records.  Singh later discovered the state-court records were not actually sealed as TES had claimed; he amended the motion to unseal to disclose that fact.  In May 2014, Judge Gilmore "unequivocally denied" the motion, noting that it was "scurrilous" and that she "fe[lt] inclined to impose sanctions."

We review a finding of contempt for abuse of discretion but not in a perfunctory way.  *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).  "Facts found by the district court will be accepted as true unless clearly erroneous, but the interpretation of the scope of the injunctive order[ ] is a question of law to be determined by the independent judgment of this Court."  *Id.* (citation and internal quotation marks omitted).  We review a district court's decision to seal a judicial record for abuse of discretion. *United States v. Holy Land Found. For Relief & Dev.*, 624 F.3d 685, 689 (5th Cir. 2010).  "Whether an alleged contemnor was afforded due process is a question of law we review de novo."  *Waste Mgmt. of Wash., Inc. v. Kattler*, 776 F.3d 336, 339 (5th Cir. 2015).

Singh and Sheehan have filed separate briefs, raising distinct issues.

### A. Singh's Appeal

### 1. First Amendment Claims

Singh argues that the district court erred by holding him in contempt for exercising his First Amendment rights.  He contends that the district court erred both by: (1) finding him in contempt for posting truthful information online intended to alert consumers to "a scam perpetrated by TES" and (2) ordering him to post a remedial statement.

*a. Internet Postings*

First, Singh argues that the internet postings are protected by the First Amendment. This is the second time Singh has challenged the injunction on First Amendment grounds before this court. In *Testmasters II*, we rejected Singh's argument that the injunction's prohibition on harassment violated the First Amendment, explaining:

> Courts have made a distinction between communication and harassment. The difference is one between free speech and conduct that may be proscribed. Although restrictions based upon conduct may incidentally restrict speech, the courts have found that such a restriction poses only a minimal burden on speech. Thus the courts do have the power to enjoin harassing communications. Courts also have the power to enjoin repeated invasions of privacy.

428 F.3d at 580 (internal citations omitted). We determined that "[t]he cantankerous relationship between these parties is clearly evident from the record in this case," and "[t]here is enough evidence presented in the record to justify an injunction order prohibiting Singh from threatening or harassing TES, its employees, its staff, TES's counsel, counsel's employees, or counsel's staff." *Id.* We concluded that the injunction went too far by prohibiting all communications between the parties' attorneys and employees, but upheld its restriction on harassing and threatening conduct. *Id.*

Singh acknowledges that this court recognized a "fundamental difference between harassing conduct and free speech" in *Testmasters II*. But Singh argues that the conduct described previously by this court involved direct interactions between parties, while the conduct here was merely published for third parties to view. Thus, Singh contends, the conduct at issue here does not fall outside the purview of the First Amendment.

The district court correctly concluded that the relevant conduct is governed by the injunction. Because this court has already upheld the

21

injunction's prohibition on harassing conduct, we need not reach Singh's various constitutional arguments.    Under Singh's interpretation of the injunction, he could post harassing comments about TES anywhere on the internet and it would not constitute harassment as long as he did not directly communicate with TES or its staff.    Singh provides no law in support of this argument and his interpretation defeats the purpose of the injunction, which is to protect TES from harassment.

*b. Remedial Statement*

Singh also appeals the district court's order requiring him to publish the following remedial statement online at ripoffreport.com:

> Robin Singh and Robin Singh Educational Services previously posted on March 25, 2010, a Complaint Review of Dr. Haku Israni and his website testmasters.com.    Singh and Dr. Israni were involved in litigation at that time and Singh would now like to retract his prior complaint.    No credence should be paid to that complaint or any of its contents.

The district court ordered that this statement be posted in response to Singh's original "deadbeat dad" posting, which discussed the state court paternity suit involving Israni.

Singh contends that this order violates his First Amendment right "not to speak."    He explains that the district court required him to "say things that simply are not true" because he does not wish to retract his complaint about Israni and believes credence *should* be paid to his comments.

We conclude that Singh's statements constitute commercial speech. "Commercial speech is 'expression related solely to the economic interests of the speaker and its audience.'" *White Buffalo Ventures v. Univ. of Tex. at Austin*, 420 F.3d 366, 374 (5th Cir. 2005) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980)).    Though the posting

focused solely on Israni's personal life, Singh must have made it with the economic interest of harming TES.

Having concluded that the speech was commercial, the question becomes whether the remedial statement was appropriate. When regulations are directed at deceptive or misleading commercial speech and require a disclosure rather than a "flat prohibition[]" on speech, the Supreme has created a standard to gauge the regulation. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Under *Zauderer*, a required disclosure need only be "reasonably related to the [government's] interest in preventing deception of consumers." *Id.*

This standard applies because Singh's original posting was deceptive. The district court's order was reasonably related to its interest in preventing consumer deception by correcting the misleading information. The analysis is complicated by Singh's argument that the required disclosure was "false" because it says he would "like" to retract the statements. We see no relevant falsehood. Whether Singh enjoyed taking this medicine is an insignificant question of phrasing.

*2. Injunction's Prohibitions*

Singh asserts that the injunction prohibiting harassment was too vague to put him on notice that he was prohibited from "speaking about matters of public concern." A party may be held in civil contempt of an injunction order if there is clear and convincing evidence that: (1) the injunction was in effect at the time of the allegedly contemptuous conduct, (2) the injunction neither vaguely nor ambiguously required the party to perform or abstain from certain conduct, and (3) the party failed to comply with the injunction's requirements. *Oaks of Mid City Resident Council v. Sebelius*, 723 F.3d 581, 585 (5th Cir. 2013). A party can only be held in contempt for violating "a definite and specific

order of the court requiring him to perform or refrain from performing a particular act . . . ." *Hornbeck*, 713 F.3d at 792 (citation and quotation marks omitted).

The original injunction prohibiting harassment was a result of TES's allegations that Singh, among other things, made harassing phone calls to TES dozens of times a day, confronted TES's counsel outside a courtroom, and allowed his attorney and other employees to obtain billing and insurance information about TES under false pretenses. He contends that none of the alleged conduct that resulted in the injunction had anything to do with his internet postings, which were made to "combat consumer confusion." Further, there was never any indication prior to the May hearing that the anti-harassment injunction limited his "right to free speech." Moreover, according to Singh, this court's reversal of part of the injunction in *Testmasters II* made it reasonable for him to believe "that his right to speak publicly about TES remained intact."

We disagree. A district court enjoys "a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order." *Id.* The district court was within its discretion in finding Singh's actions were harassment in violation of the injunction. Singh's argument is meritless.

*3. Sealed Records*

Singh next argues that the district court abused its discretion by sealing the record of the contempt proceedings. The public has a common-law right to inspect and copy judicial records. *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) (citations omitted). That right "is not absolute." *Id.* "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes."

*Id.* (citation and quotation marks omitted). Examples of an improper purpose recognized by the Supreme Court include using records "to gratify private spite or promote public scandal . . . ." *Nixon v. Warner Commc'ns., Inc.*, 435 U.S. 589, 598 (1978) (citations and quotation marks omitted).

In exercising its discretion, a district court must "balance the public's common law right of access against the interests favoring nondisclosure." *Van Waeyenberghe*, 990 F.2d at 848. In *Van Waeyenberghe*, we held that a district court abused its discretion by sealing judicial records. *Id.* at 849. We reversed based on a lack of "evidence in the record that the district court balanced the competing interests prior to sealing the final order." *Id.* TES wanted the records sealed in anticipation of Singh's "republish[ing] the descriptions of his harassing conduct and the evidence attached thereto, invoking the public's common law right to inspect and copy court records in an attempt to avoid liability under the 2004 injunction and this Court's judgments . . . ." TES claims the sealing was necessary to avoid further damage.

Singh argues that, like in *Van Waeyenberghe*, the district court abused its discretion by failing to balance the competing interests prior to sealing the relevant records. The argument is unconvincing. Though the district court did not conduct an on-the-record analysis, we find it implicit in the record that such an analysis was made. The district court has an extensive history with these parties and is uniquely familiar with the facts of the case. We do not see that the district court abused its discretion in sealing records that might have been used for improper purposes.

*4. Reassignment*

Singh and Sheehan both argue that we should reassign the case being handled by Judge Gilmore to a different district judge for future proceedings. *See* 28 U.S.C. § 2106. Ordering reassignment of a case is an "extraordinary

power that is rarely invoked." *In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002) (citation and internal quotation marks omitted). Two tests help us resolve issues of reassignment. *See id.* at 700–01. First, we consider whether the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *Id.* at 701 (citations and quotation marks omitted). Second, we consider the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 700–01 (citations omitted).

Singh provides numerous examples that, according to him, show that Judge Gilmore has "anti-Singh" views and is unable to remain objective. Singh made a similar argument in *Testmasters II*, which we rejected. *See* 428 F.3d at 581–82. There, we stated that "'judicial rulings alone almost never constitute a valid basis' for finding bias or impartiality." *Id.* at 581 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). We reviewed "the substantial record that has accumulated over the course of these parties' long litigious relationship," and concluded that "any district court might become exasperated with both parties"; we therefore denied Singh's request for reassignment. *Id.*

We again decline to reassign this case to a different district judge.

*B. Sheehan's Appeal*

*1. Due Process*

Sheehan contends that the district court violated his right to due process by failing to provide him with proper notice and an adequate opportunity to respond.  He argues that the show cause order, which named only Singh, was insufficient to provide him notice that he could potentially be held in contempt. "In general, due process requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses." *Waste Management*, 776 F.3d at 339–40 (citation and internal quotation marks omitted).

*Waste Management* involved a due-process argument similar to that made by Sheehan here. *See id.* at 339–41.  There, an attorney held in contempt argued that he had not been afforded adequate due process. *Id.* at 339.  The motion to show cause listed the client "as the sole potential contemnor whose liability was to be addressed at the hearing." *Id.*  We vacated the contempt order, holding that the notice was insufficient: "This notice did not signal to [the attorney] that he could be found in contempt because it identified [the client] alone as the party whose contempt liability was to be adjudicated." *Id.* at 340.  "Adequate notice typically takes the form of a show-cause order and a notice of hearing identifying each litigant who might be held in contempt." *Id.* at 340 & n.12 (citing *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995) (explaining that show-cause notice must put the potential contemnor on notice that sanctions "were being considered *against him personally*")).

Sheehan, similarly, was not provided adequate due process.  He had no notice that he may potentially be held in contempt.  In *Waste Management*, we

No. 13-20250 c/w 13-20327; 14-20113

vacated the contempt order, but went on to examine the merits of the contempt finding. *See id.* at 340–41. We do the same here.

*2. Contempt Finding*

Sheehan argues that the district court erred by finding him in contempt. A party may be held in civil contempt of an injunction order if there is clear and convincing evidence that: (1) the injunction was in effect at the time of the allegedly contemptuous conduct, (2) the injunction neither vaguely nor ambiguously required the party to perform or abstain from certain conduct, and (3) the party failed to comply with the injunction's requirements. *Oaks of Mid City*, 723 F.3d at 585 (citations omitted). In a contempt proceeding, evidence is clear and convincing if it "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established . . . ." *Id.* (citation and quotation marks omitted).

Sheehan argues that under this stringent standard, the evidence does not show clearly or convincingly that he "did anything that the injunction orders prohibited or failed to do something that the injunction orders required." The relevant section of the injunction prohibited Singh from harassing TES. Sheehan concedes that this prohibition was also binding on him as Singh's attorney, but he urges that there is no evidence that he engaged in any of the conduct at issue.

Sheehan explains that the district court mentioned four bases for finding him in contempt: (1) for espousing positions unsupported by law, (2) for failing to tell his client that he might violate the injunction by posting materials online, (3) for assisting Singh by convincing him that he was entitled to First Amendment protection, and (4) because an attorney can be responsible for his client's conduct. Sheehan argues that the first three bases cannot support a finding of contempt because there is still no evidence that he violated the

28

injunction. The fourth basis fails because vicarious liability does not allow an agent to be held responsible for the actions of his principal.

There was not clear and convincing evidence upon which to find that Sheehan violated the injunction's requirements. We accept that the injunction was binding on Sheehan as Singh's attorney, but there was insufficient evidence to find that he personally violated the injunction. We therefore conclude that the district court abused its discretion by finding Sheehan in contempt.[2]

This case demonstrates how open our courts are to litigants, so open as at times to lead to questionable litigation. This controversy has been before the district courts and this court four times. The parties are reminded that access to our courts is not unlimited. Litigation over a controversy must eventually come to an end. Further attempts to re-litigate issues related to this controversy without a substantial justification for renewing the quarrel may subject the litigants to sanctions. We VACATE the contempt findings as to Sheehan. We AFFIRM in all other respects.[3]

---

[2] Sheehan also contends that "apart from whether [he] violated any aspect of the injunction orders, there remains the question whether the district court abused its discretion in ordering him to be incarcerated for up to five days or until Singh removed the [i]nternet postings." Having concluded that the district court erred in holding Sheehan in contempt, we find it unnecessary to reach that issue.

[3] All pending motions are DENIED.